## RIDEAU *v.* LOUISIANA.

No. 630.   Argued April 29, 1963.—Decided June 3, 1963.

*Fred H. Sievert, Jr.* argued the cause and filed a brief for petitioner.

*Frank Salter* argued the cause for respondent.   With him on the brief were *Jack P. F. Gremillion,* Attorney General of Louisiana, and *Robert S. Link, Jr., John E. Jackson, Jr.* and *M. E. Culligan,* Assistant Attorneys General.

MR. JUSTICE STEWART delivered the opinion of the Court.

On the evening of February 16, 1961, a man robbed a bank in Lake Charles, Louisiana, kidnapped three of the

724

bank's employees, and killed one of them. A few hours later the petitioner, Wilbert Rideau, was apprehended by the police and lodged in the Calcasieu Parish jail in Lake Charles. The next morning a moving picture film with a sound track was made of an "interview" in the jail between Rideau and the Sheriff of Calcasieu Parish. This "interview" lasted approximately 20 minutes. It consisted of interrogation by the sheriff and admissions by Rideau that he had perpetrated the bank robbery, kidnapping, and murder. Later the same day the filmed "interview" was broadcast over a television station in Lake Charles, and some 24,000 people in the community saw and heard it on television. The sound film was again shown on television the next day to an estimated audience of 53,000 people. The following day the film was again broadcast by the same television station, and this time approximately 29,000 people saw and heard the "interview" on their television sets. Calcasieu Parish has a population of approximately 150,000 people.

Some two weeks later, Rideau was arraigned on charges of armed robbery, kidnapping, and murder, and two lawyers were appointed to represent him. His lawyers promptly filed a motion for a change of venue, on the ground that it would deprive Rideau of rights guaranteed to him by the United States Constitution to force him to trial in Calcasieu Parish after the three television broadcasts there of his "interview" with the sheriff.[1] After a hearing, the motion for change of venue was denied, and

---

[1] The motion stated: "That to require the Defendant to be tried on the charges which have been preferred against him in the Parish of Calcasieu, would be a travesty of justice and would be a violation to the Defendant's rights for a fair and impartial trial, which is guaranteed to every person accused of having committed a crime by the Constitution of the State of Louisiana and by the Constitution of the United States."

Rideau was accordingly convicted and sentenced to death on the murder charge in the Calcasieu Parish trial court.

Three members of the jury which convicted him had stated on *voir dire* that they had seen and heard Rideau's televised "interview" with the sheriff on at least one occasion. Two members of the jury were deputy sheriffs of Calcasieu Parish. Rideau's counsel had requested that these jurors be excused for cause, having exhausted all of their peremptory challenges, but these challenges for cause had been denied by the trial judge. The judgment of conviction was affirmed by the Supreme Court of Louisiana, 242 La. 431, 137 So. 2d 283, and the case is here on a writ of certiorari, 371 U. S. 919.

The record in this case contains as an exhibit the sound film which was broadcast. What the people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff.[2] The record fails to show whose idea it was to make the sound film, and broadcast it over the local television station, but we know from the conceded circumstances that the plan was carried out with the active cooperation and participation of the local law enforcement officers. And certainly no one has suggested that it was Rideau's idea, or even that he was aware of what was going on when the sound film was being made.

---

[2] The Supreme Court of Louisiana summarized the event as follows: "[O]n the morning of February 17, 1961, the defendant was interviewed by the sheriff, and the entire interview was filmed (with a sound track) and shown to the audience of television station KPLC–TV on three occasions. The showings occurred prior to the arraignment of defendant on the murder charge. In this interview the accused admitted his part in the crime for which he was later indicted." 242 La., at 447, 137 So. 2d, at 289.

In the view we take of this case, the question of who originally initiated the idea of the televised interview is, in any event, a basically irrelevant detail. For we hold that it was a denial of due process of law to refuse the request for a change of venue, after the people of Calcasieu Parish had been exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged. For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.

In *Brown* v. *Mississippi,* 297 U. S. 278, this Court set aside murder convictions secured in a state trial with all the formalities of fair procedures, based upon "free and voluntary confessions" which in fact had been preceded by grossly brutal kangaroo court proceedings while the defendants were held in jail without counsel. As Chief Justice Hughes wrote in that case, "The State is free to regulate the procedure of its courts in accordance with its own conceptions of policy . . . . [But] it does not follow that it may substitute trial by ordeal." 297 U. S., at 285. Cf. *White* v. *Texas,* 310 U. S. 530. That was almost a generation ago, in an era before the onrush of an electronic age.

The case now before us does not involve physical brutality. The kangaroo court proceedings in this case involved a more subtle but no less real deprivation of due process of law. Under our Constitution's guarantee of due process, a person accused of committing a crime is vouchsafed basic minimal rights. Among these are the right to counsel,[3] the right to plead not guilty, and the

---

[3] *Gideon* v. *Wainwright,* 372 U. S. 335.

right to be tried in a courtroom presided over by a judge. Yet in this case the people of Calcasieu Parish saw and heard, not once but three times, a "trial" of Rideau in a jail, presided over by a sheriff, where there was no lawyer to advise Rideau of his right to stand mute.

The record shows that such a thing as this never took place before in Calcasieu Parish, Louisiana.[4] Whether it has occurred elsewhere, we do not know. But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised "interview." "Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death." *Chambers* v. *Florida*, 309 U. S. 227, 241.

*Reversed.*

MR. JUSTICE CLARK, with whom MR. JUSTICE HARLAN joins, dissenting.

On the evening of February 16, 1961, the petitioner, Wilbert Rideau, was arrested and confined in the Calcasieu Parish jail in Lake Charles, Louisiana. The arrest

---

[4] "Q. Mr. Mazilly, you have been in police work roughly 21 years?

"A. Yes, sir.

"Q. Were you in court yesterday at the time a sound on film picture was shown to the court which had been shown on KPLC–TV encompassing an interview between Sheriff Reid and Rideau?

"A. I was.

"Q. In all of your 21 years, do you know of any similar case in this parish or Southwest Louisiana where a man charged with a capital crime was allowed—that pictures were made of him and the general public was shown the pictures and a sound track in which he confessed to a capital crime?

"A. No, sir."

arose out of a bank robbery and a subsequent kidnapping and homicide. On the night of his arrest petitioner made detailed oral and written confessions to the crimes, and on the following morning a sound film was made of an interview between the sheriff and petitioner in which he again admitted commission of the crimes. The film was broadcast on a local television station on February 17, 18, and 19, 1961.

On March 3, 1961, petitioner was arraigned on charges of armed robbery, kidnapping and murder. As required under the law of Louisiana, he pleaded not guilty to the two capital crimes, but he entered a plea of guilty to the charge of armed robbery. Counsel were appointed immediately, and they requested permission to withdraw the plea of guilty to armed robbery, which motion was granted. They then filed a motion to quash, and the State was required to elect under which count it wished to proceed. The State elected the murder count, and the trial was set for April 10, 1961.

The defense moved for a change of venue, which was denied after hearing. Thereupon a jury was empaneled and petitioner was tried and convicted of murder. The Louisiana Supreme Court affirmed and this Court now reverses that judgment, holding that the denial of petitioner's motion for change of venue was a deprivation of due process of law. Having searched the Court's opinion and the record, I am unable to find any deprivation of due process under the Fourteenth Amendment and I therefore dissent.

At the outset, two matters should be clearly established. First, I do not believe it within the province of law enforcement officers actively to cooperate in activities which tend to make more difficult the achievement of impartial justice. Therefore, if this case arose in a federal court, over which we exercise supervisory powers, I would vote to reverse the judgment before us. Cf. *Marshall* v.

*United States,* 360 U. S. 310 (1959). It goes without saying, however, that there is a very significant difference between matters within the scope of our supervisory power and matters which reach the level of constitutional dimension. See, *e. g., Stein* v. *New York,* 346 U. S. 156, 187 (1953); *Brown* v. *Allen,* 344 U. S. 443, 476 (1953).

Second, I agree fully with the Court that one is deprived of due process of law when he is tried in an environment so permeated with hostility that judicial proceedings can be "but a hollow formality." This proposition, and my position with regard thereto, are established in *Irvin* v. *Dowd,* 366 U. S. 717 (1961). At this point I must part company with the Court, however, not so much because it deviates from the principles established in *Irvin* but because it applies no principles at all. It simply stops at this point, without establishing any substantial nexus between the televised "interview" and petitioner's trial, which occurred almost two months later. Unless the adverse publicity is shown by the record to have fatally infected the trial, there is simply no basis for the Court's inference that the publicity, epitomized by the televised interview, called up some informal and illicit analogy to *res judicata,* making petitioner's trial a meaningless formality. See *Beck* v. *Washington,* 369 U. S. 541 (1962).

That the Court apparently does not realize the necessity of establishing this nexus is illustrated by its reliance on *Brown* v. *Mississippi,* 297 U. S. 278 (1936). That case and its progeny * stand for the proposition that one may not constitutionally be convicted of a crime upon evidence including a confession involuntarily made. There can be no more clear nexus between the action of state officials before trial and the trial itself than when the results of that action are admitted in evidence at the

---

*See Ritz, Twenty-five Years of State Criminal Confession Cases in the U. S. Supreme Court, 19 Wash. & Lee L. Rev. 35 (1962).

trial. Here, of course, neither the filmed interview nor any transcript of it was shown or read to the jury. While the oral and written confessions made on the night of the arrest were admitted in evidence, the only argument for their exclusion made by the petitioner is that they were obtained at an interrogation when he had not been advised of his right to counsel and did not have counsel present. That argument is clearly answered by our decisions in *Cicenia* v. *Lagay,* 357 U. S. 504 (1958), and *Crooker* v. *California,* 357 U. S. 433 (1958).

The fact that the adverse publicity was not evidence in the case is not controlling, however, for we have recognized that such matter may, in unusual circumstances, fatally infect a trial when it enters the courtroom indelibly imbedded in the minds of the jurors. We found such a situation in *Irvin* v. *Dowd, supra,* where the continuous wave of publicity concerning the offense and the past record of the petitioner so permeated the area where he was tried that

> "[a]n examination of the 2,783-page *voir dire* record shows that 370 prospective jurors or almost 90% of those examined on the point . . . entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty. A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on a jury." 366 U. S., at 727.

More important, of the 12 jurors finally placed in the jury box eight thought petitioner Irvin to be guilty. In view of those circumstances we unanimously reversed the judgment in that case, with the caveat that

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected

> to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Id.*, at 722–723.

Thus, in *Irvin,* because of the complete permeation, imbedding opinions of guilt in the minds of 90% of the veniremen and two-thirds of the actual jury, we held that petitioner had been deprived of his constitutional right to an impartial tribunal. Compare *Beck* v. *Washington, supra.* We now face the question whether this is such a situation and, for that determination, we must examine the publicity involved, the hearing on the motion for change of venue and the record of the *voir dire* examination.

Initially, we face an obstacle in determining the pervasiveness of the televised interview, since the circulation of a television program is less susceptible of determination than that of a newspaper. The figures quoted by the Court as representing the number of people who "saw and heard" the interview were given by the Program Director of the television station and represented the typical number of viewers at the times when the interview was broadcast, as determined by a rating service which had conducted a sampling some months previous to the broadcasts. The Director testified that those figures represented "an approximate number and, as I say, there is no way you can prove this because communications is an intangible business . . . ." Of course, assuming *arguendo* the accuracy of the figures given, there is no way of deter-

mining whether those figures are mutually inclusive or whether they represent different viewers on the different occasions. The record does give a more tangible indication of the effect of the publicity, however, in the hearing on the motion for change of venue. At that hearing five witnesses testified that, in their opinions, petitioner could not get a fair trial in the parish. Twenty-four witnesses testified that, in their opinions, petitioner could get a fair trial and a stipulation was entered that five more witnesses would testify that he could get a fair trial in the parish.

The most crucial evidence relates to the composition of the 12-man jury. Of the 12 members of the panel only three had seen the televised interview which had been shown almost two months before the trial. The petitioner does not assert, and the record does not show, that these three testified to holding opinions of petitioner's guilt. They did testify, however, that they

> "could lay aside any opinion, give the defendant the presumption of innocence as provided by law, base their decision solely upon the evidence, and apply the law as given by the court. As the judge stated in his per curiam: 'They testified they could do so notwithstanding anything they may have heard, seen or read of the case.'" 242 La. 431, 462, 137 So. 2d 283, 295.

Further, two members of the jury held honorary Deputy Sheriff's commissions from the Sheriff's department. Neither of these men was in any way connected with the department as a deputy, neither had ever made any arrests and neither had ever received any pay from the department. They both testified that they used the honorary commissions only for their convenience. They testified that these honorary commissions would not affect their ability to serve as jurors in any way, and the trial

judge concluded that this tenuous relationship with the State did not destroy their qualifications to serve. Cf. *Frazier* v. *United States,* 335 U. S. 497 (1948); *United States* v. *Wood,* 299 U. S. 123 (1936).

The right to a trial before a fair and impartial tribunal "is a basic requirement of due process," *In re Murchison,* 349 U. S. 133, 136 (1955), and must be safeguarded with vigilance. As we recognized in *Irvin,* however, it is an impossible standard to require that tribunal to be a laboratory, completely sterilized and freed from any external factors. The determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge. And when the jurors testify that they can discount the influence of external factors and meet the standard imposed by the Fourteenth Amendment, that assurance is not lightly to be discarded. When the circumstances are unusually compelling, as in *Irvin,* the assurances may be discarded, but "it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside . . . ." *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 281 (1942). Since the petitioner clearly has not met that burden, I would affirm the judgment before us.