UNITED STATES of America, Plaintiff-Appellee,

v.

William August Halm WILLIAMS, Defendant-Appellant.

No. 74–3297.

United States Court of Appeals, Fifth Circuit.

Nov. 28, 1975.

3. And, if it had been a party, serious § 1983 questions would have been presented.

Tyrus R. Atkinson, Jr., Atlanta, Ga. (Court-appointed), George J. Parnham, Houston, Tex., William A. H. Williams, Atlanta, Ga., for defendant-appellant.

John W. Stokes, U. S. Atty., William P. Gaffney, Steven W. Ludwick, Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before TUTTLE, THORNBERRY and MORGAN, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellant William Williams was convicted by a jury of extortion, 18 U.S.C. § 1951, use of the mails to transmit an extortionate communication, 18 U.S.C. § 876, and use of a firearm in the commission of a felony, 18 U.S.C. § 924(c). The trial judge imposed sentences of twenty years, ten years, and another ten years on the respective convictions, all to run consecutively. The instant appeal followed, in which appellant raises an expansive array of challenges to his convictions. The decision reached by this court, however, limits the necessary scope of our consideration to three of the many arguments tendered by appellant. The difficult and delicate concerns of

pretrial publicity, the extent to which prosecutorial zeal must remain checked by the rights of an accused, and the sometimes close relationship between the two all coalesce in this case to require reversal of appellant's convictions and remand for a new trial.

On the evening of February 20, 1974, appellant Williams arrived at the home of Reginald Murphy, then editor of the Atlanta Constitution newspaper. Appellant, representing himself to be a "Mr. Woods," had previously contacted Murphy regarding a possible donation of several hundred thousand gallons of fuel oil to a suitable charity during the energy crisis. Continuing his still unsuspected ruse, appellant lured Murphy from his home on the pretext of visiting an attorney in order that transfer of title to the fuel oil could be consummated. Shortly after departing the Murphy home, appellant produced a gun and informed Murphy that he had been kidnapped by a "colonel in the American Revolutionary Army." Bound and deposited in the trunk of an automobile, Murphy was taken to appellant's home where he was forced to spend the night. The next morning appellant induced Murphy to prepare a tape recorded ransom demand that was subsequently mailed to the offices of the Atlanta Constitution. The ransom demand was shortly met by Murphy's employer,[1] and after forty-nine hours of captivity, Murphy was released unharmed. Approximately five hours after Murphy's release, the FBI apprehended appellant at his home and recovered the ransom money. Reaction of the news media to the kidnapping was virtually instantaneous, and the metropolitan Atlanta area was blanketed with radio, television, and newspaper coverage from almost the moment the ransom message was delivered. After Murphy's release, a four-thousand word article in the Sunday edition of the Atlanta Journal-Constitution,[2] under Murphy's byline, provided a first-person account of the kidnapping and Murphy's "positive identification" of Williams as the perpetrator of the kidnapping. Extensive reporting of Murphy's identification of Williams naturally followed in smaller area newspapers, the national wire services, and the national news magazines—Time and Newsweek.[3] In addition to Murphy's identification, appellant's prior criminal record, his poor credit rating, excerpts from his diary that had been confiscated by the FBI, his overwhelming anti-Semitism, the impressions of his friends and neighbors, and in short, every aspect of his life became grist for the reporter's mill. The day of his arrest, appellant was briefly interviewed by television reporters while leaving a bail hearing. In response to questions, appellant stated for the television audience that while the American Revolutionary Army had suffered a defeat, he did not consider it a final defeat. Naturally, appellant's interview was widely and frequently rebroadcast. Record on Appeal, Vol. I at 175. Over one hundred articles on the kidnapping and the kidnapper appeared in the Journal and the Constitution before the hearing on appellant's motion for change of venue. Local media cover-

---

1. The ransom demand delivered to the newspaper called for payment of $700,000 in exchange for Murphy's freedom. Appellant's argument that an insufficient impact on interstate commerce was shown to support jurisdiction under 18 U.S.C. § 1951 is without merit. *See Esperti v. United States*, 5 Cir. 1969, 406 F.2d 148.

2. The Atlanta Constitution and the Journal are the leading newspapers in the metropolitan Atlanta area, and each has a total circulation in excess of 200,000. The two papers are combined in a Sunday edition, and it was here that the Murphy narrative appeared. The influence of these two newspapers in the Atlanta area is unquestioned, and perhaps the best testimony to that fact came from Judge O'Kelley himself when he characterized the Constitution as "cover[ing] Dixie like the Dew." Record on Appeal, Vol. II at 103.

3. Testimony at the hearing on appellant's motion for change of venue revealed that the greater Atlanta circulation of Time Magazine is approximately 40,000 and the same figure for Newsweek is in the area of 30,000. Record on Appeal, Vol. II at 8, 14. The March 4 issue of Time characterized appellant and his wife as an "antisemitic, red-neck couple" engaged in a fast money scheme. *Id.*, Vol. I at 136.

age continued unabated throughout the remainder of February and into early March. Appellant, along with his wife, was indicted on March 7, and the following day he entered a plea of not guilty. During the next two months close attention was paid by the media to the procedural moves made in preparation for appellant's trial, though the intensity of the coverage was somewhat diminished in comparison to that contemporaneous with the kidnapping.[4] In early May, however, the public's attention was again sparked when it was reported that FBI agents appearing at a hearing on appellant's motion to suppress certain evidence testified that appellant had confessed to the kidnapping following his arrest.[5] Shortly thereafter, on May 9, a one-hour television special devoted to the kidnapping—and featuring an interview with victim Murphy—was broadcast over WSB–TV in Atlanta. Similar television specials were aired prior to May 9, and at least two specials featuring Murphy were televised prior to the filing of appellant's motion for transfer on March 25.[6] We attach particular significance to the May 9 special because it was the closest in point of time to the beginning of appellant's trial.[7] In the course of the May 9 special, Murphy was interviewed regarding the details of his kidnapping and his impressions of appellant. Murphy again repeated his positive identification of appellant, and at several points in the interview ventured thumbnail sketches of appellant's character and personality.[8] The following excerpts, taken from various points in the transcript of the May 9 special, indicate the flavor of the character study provided by Murphy.

> Interviewer: Tell us about the Colonel. Give us a personality sketch. You know him pretty well.

**4.** In the two months after the kidnapping a wave of editorials appeared, and the Hearst and Murphy kidnappings were subject to frequent comparison. The focus of a good many of the editorials that appeared in this period was the measures needed to combat the rising tide of terrorist activities in the United States. Perhaps the most extreme example appeared in the limited circulation Gwinnet Daily News, serving one of the counties making up the metropolitan Atlanta area.

> Better our lawmen fracture the civil rights of a few suspects than to allow the outrage of kidnap to become the custom in a land terrorized by underground forces—citizen arrest—form posses to hunt down the abductors . . . . [T]he lives of many sons and daughters, wives and honest breadwinners, are up for grabs unless we make America fatally unsafe [for kidnappers].

Record on Appeal, Vol. I at 144.

**5.** The story of appellant's confession actually broke on April 10 when the United States filed responsive pleadings, which revealed the confession, to appellant's motion to suppress. Media coverage of the confession, however, reached a highwater mark with the testimony of the FBI agents.

**6.** The May 9 special was in fact a rebroadcast of a special appearing on WSB–TV on February 25, 1974, shortly after the release of Murphy. Record on Appeal, Vol. IV at 138. Victim Murphy also appeared on the "Mike Douglas Show" on March 6, 1974, and discussed various aspects of his kidnapping. The latter television show was also shown in the Atlanta area. *Id.* at 139.

**7.** Due to limited financial resources, appellant's appointed trial counsel was unable to gather and present statistical information that might have provided an accurate indication of the viewer response to the May 9 special or the extent to which it shaped public opinion in the Atlanta area. Looking, as we do, to the whole record in reversing appellant's convictions, we do not attach undue significance to this isolated failure of proof. Rather, the cumulative effect of events that worked to deprive appellant of a fair trial overcomes this small, albeit important, hiatus in the proof of appellant's prejudicial publicity claim.

**8.** This was not the first time that Murphy attempted to analyze appellant's behavior. For example, Associated Press wire stories in late February and early March contained Murphy's descriptions of Williams as a "sick man," "totally disoriented," and "not the sharpest of men but very canny in some ways." Indeed, most of the early articles by Murphy appearing in the Constitution immediately after his release contained similar remarks. Record on Appeal, Vol. I at 154. Appearing on the Today Show, broadcast into the Atlanta area on the Monday morning following his release, Murphy proffered an outline of appellant's racist political orientation and psychological makeup. *Id.* at 208–17.

Murphy: Yeah, he's an old friend of mine. He told me that he grew up in Florida, that his father used to beat him so badly when he was a small child that he was ashamed to go to school. When he was eleven, he tried to kill his father. When he was thirteen he ran away from home. He said he went to Florida State University and he used to play handball. Whether that's true, I don't know. He said he was in the military twice, he said he was a prisoner of the Viet Cong for four years. I am told that it [is] not the case, but I don't know.

. . . . .

He said that he had some military experience in the Air Force, and I think, in fact, he was in the Navy, somebody told me later, and as a matter of fact I think his record shows he went AWOL, but he certainly didn't tell me that. He told me that he was a Colonel in the Air Force. He also wanted me to think, he told me that he had a master's degree in economics, and he said "I guess you've already figured that out," and I said, "Colonel, I knew that you knew a great deal of economics, but I certainly didn't realize what the degree was," because, you see, I really had to flatter a guy like that, particularly him. He was really very insecure.

. . . . .

Let me go back. I didn't even have access to television at that time, but there were radio people who jumped by an hour and a half the time when I really got released and that really gave me butterflies because the Colonel felt like he could then say, "Well, I released him and somebody else must have done this." It was a crazy kind of idea from his point of view.

. . . . .

He is almost the most anti-Semitic man I've ever heard in my life. Everything is a conspiracy run by Jews.

Record on Appeal, Vol. I at 182, 193, 196.

Following hearings before a magistrate on April 22 and May 2, the district court denied appellant's motion for a change of venue on July 28. The denial was, however, conditioned on the ability of voir dire examination to produce a fair and impartial jury. The examination subsequently conducted was meticulous in every respect. All panel members were carefully questioned regarding, inter alia, their knowledge of the facts of appellant's case, the degree of their exposure to the media coverage of the kidnapping and later events, and the extent to which they held any opinion as to the guilt or innocence of appellant. All members of the jury panel were familiar to some degree with the facts of the kidnapping, see Record on Appeal, Vol. VI at 24, and twenty-two out of seventy-one panel members were excused on the basis of a pre-existing opinion as to appellant's guilt. Satisfied with the jury ultimately empanelled, however, the district court called appellant's case to trial on the following day, July 29. The consistently argued defense position was lack of mental responsibility at the time the offense was committed. Taking the stand in his own defense, appellant Williams conceded that he was in fact the perpetrator of the kidnapping. The defense witnesses called were for the purpose of establishing appellant's insanity defense, and at no point was the evidence in dispute that Williams had in fact been the kidnapper of Murphy. Without attempting a lengthy review of the evidence adduced at trial, it can only be remarked that the issue of appellant's mental responsibility was sharply contested. On August 4, final argument to the jury began. After summarizing the evidence, the Assistant United States Attorney made the following argument to the jury.

Ladies and gentlemen, I will submit to you that this defendant wants to fool you. He's heard all the testimony. It's by virtue of his testimony, when he was asked "Tell me about your childhood?" "Oh, my childhood—it was a very unhappy childhood". I just

felt he was reading from that [psychiatric] report. This defendant is a put-on. I submit to you that he wants to be acquitted. He wants to walk out of this courtroom. Ladies and gentlemen, if he walks out of this courtroom, this is a blank check, this is a blank check for this man to go out and commit a crime against you, against Judge O'Kelley, against your families, against your friends, and if he gets caught he can run down to Doctor Askren and get some—

Record on Appeal, Vol. XII at 1924.

At this point, appellant's attorney objected and moved for a mistrial on the basis of improper closing argument. While the trial judge denied the motion, he did give the jury a cautionary instruction to disregard the line of argument made by the government. The same day the jury found appellant guilty on all counts.

■ When a criminal defendant alleges that pretrial publicity precluded a trial consistent with standards of due process, it is the duty of a reviewing court to undertake an independent evaluation of the facts established in support of such an allegation. *See Irvin v. Dowd*, 1961, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751; *Calley v. Callaway*, 5 Cir. 1975, 519 F.2d 184; *Hale v. United States*, 5 Cir. 1970, 435 F.2d 737; *Pamplin v. Mason*, 5 Cir. 1966, 364 F.2d 1. The traditional measure of undue prejudice required that a clear nexus between community prejudice and jury opinion be demonstrated. Under such a test, it would have been necessary for appellant Williams to show that community prejudice had in fact invaded the jury box, *see Irvin v. Dowd, supra; Stroble v. California*, 1952, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872, and Williams has made no showing to this effect. More recent Supreme Court cases, however, hold that

evidence of pervasive community prejudice dispenses with the requirement that actual jury prejudice be shown. *See Sheppard v. Maxwell*, 1966, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; *Estes v. Texas*, 1965, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543; *Turner v. Louisiana*, 1965, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424; *Rideau v. Louisiana*, 1963, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663. As indicated by a panel of this circuit in *Pamplin v. Mason, supra* at 5,

[t]he test is no longer whether prejudice found its way into the jury box at the trial . . .. As we read the Supreme Court cases, the test is: Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable procedural safeguards, such as change of venue, to assure a fair and impartial trial.

■ Appellant Williams technically brings his pretrial publicity argument before this court in the form of a challenge to the district court's denial of his Rule 21(a) motion for change of venue.[9] The well established rule vests substantial discretion in the district court as to the granting or denying of a motion for transfer, and absent an abuse of discretion, the district court's ruling will not be disturbed on appeal. *See United States v. Noland*, 5 Cir. 1974, 495 F.2d 529; *United States v. Thaggard*, 5 Cir. 1973, 477 F.2d 626, *cert. denied*, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469; *United States v. Nix*, 5 Cir. 1972, 465 F.2d 90, *cert. denied*, 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307; *Greenhill v. United States*, 5 Cir. 1962, 298 F.2d 405, *cert. denied*, 372 U.S. 968, 83 S.Ct. 1092, 10 L.Ed.2d 130. We are not prepared, nor are we required to hold that the district court abused its discretion in denying ap-

**9.** The rule provides that:

The court upon motion of the defendant shall transfer the proceeding as to him to another district whether or not such district is specified in the defendant's motion if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district.

Fed.R.Crim.Proc. 21(a), 18 U.S.C.

pellant's Rule 21 motion.[10] Rather, we widen the breadth of our consideration to the tandem effect created by the intense pretrial publicity and the closing argument offered by the United States.[11] We intimate no view as to whether the pretrial publicity or the closing argument alone would necessitate reversal of appellant's convictions. We do hold, however, that these two factors operating together deprived appellant of a fair trial.

Reaching a verdict on appellant's guilt—in effect determining his mental responsibility for the offenses charged—required the jury to digest and analyze a complicated body of scientific theory and terminology, and with the aid of legal rules, apply their newly acquired knowledge to the facts as they determined them. The task resting upon the members of the jury called for clear-headed deliberation unencumbered by passion, prejudice, or a confusion of the issues. Victim Murphy's widely publicized and televised appraisals of appellant's personality made the task difficult; burdened by the closing argument of the Assistant United States Attorney, the task became impossible. It may be argued that the character of Murphy's

remarks made appellant's insanity defense all the more plausible. Separating out that which aided and that which hindered appellant's insanity defense in the minds of the jurors is a chore too subtle and too rife with uncertainty to be undertaken by a court. It is also unnecessary. The principle that controls limits an adjudication of guilt to evidence adduced in open court and subject to cross-examination. As admonished by Mr. Justice Clark in *Irvin v. Dowd*, 81 S.Ct. at 1642.

> [the jury's] verdict must be based upon the evidence developed at the trial. . . . This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807).

*See Sheppard v. Maxwell, supra*; *Marshall v. United States*, 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250; *Patterson v. Colorado*, 1907, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879. The wide dissemination of Murphy's comments on appellant's personality, *see Sheppard v. Maxwell, supra*; *Estes v. Texas, supra,* the character of those comments, *see*

10. The court below conditioned its denial of appellant's Rule 21 motion on the ability of voir dire examination to produce a fair and impartial jury. Holding a final decision on the motion in abeyance pending the conclusion of voir dire is clearly the preferable procedure. *See Murphy v. Florida*, 1975, —— U.S. ——, 95 S.Ct. 2031, 44 L.Ed.2d 589; *United States v. Nix*, 5 Cir. 1972, 465 F.2d 90, 96, *cert. denied*, 409 U.S. 1013, 93 S.Ct. 455, 34 L.Ed.2d 307. This is not to say that the trial court should attach undue emphasis to the results of voir dire examination. While the results of voir dire examination are an important factor in gauging the depth of community prejudice, *see Rideau v. Louisiana*, 1963, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, continual protestations of impartiality from prospective jurors are best met with a healthy skepticism from the bench. *Pamplin v. Mason*, 5 Cir. 1966, 364 F.2d 1, 6 n. 9.

11. With the issue thus framed, we decline consideration of two threshold problems that would inhere in an examination of the trial court's exercise of discretion in denying appel-

lant's Rule 21 motion. First, the relationship between the discretion that a trial judge can exercise in denying a Rule 21 motion and the applicable due process standards is not altogether clear. Certainly, due process standards place a bottomline on the discretion exercisable by the district court, but the real question is the degree by which the district court's discretion operates within boundaries somewhat narrower than those set by due process. Second, the extent to which a reviewing court can look to the actual conduct of the trial in passing on the denial of a Rule 21 motion is similarly a concern not completely free from difficulty. In the instant case, for example, a great deal of the pretrial publicity dealt with Murphy's "positive identification" of Williams. By looking to the actual conduct of the trial— where Williams relied solely on an insanity defense—the impact of this identification publicity is arguably diminished. Given our broader focus on the background of appellant's prosecution and the events at his trial, we withhold any suggestion as to the correct resolution of these issues.

*Beck v. Washington*, 1962, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98, their proximity to the time of trial, *see Bostick v. United States*, 5 Cir. 1968, 400 F.2d 449, *cert. denied*, 1969, 393 U.S. 1068, 89 S.Ct. 725, 21 L.Ed.2d 712, and the familiarity of the panel members with the crime charged, *see Hale v. United States*, 5 Cir. 1970, 435 F.2d 737, all suggest the probability of a proceeding not limited to evidence properly introduced before the trier of fact. In like manner, the closing argument employed by the government unduly confused the issue of appellant's mental responsibility. In the federal courts, a finding of not guilty by reason of insanity results in the release of the defendant from custody. Knowledge of this fact by the jury poses a significant impediment to a verdict based solely on evidence as to the defendant's mental responsibility. In *Bruce v. Estelle*, 5 Cir. 1973, 483 F.2d 1031, 1039, this court condemned a closing argument not unlike that employed in the instant case. The *Bruce* court was not willing to hinge its reversal of petitioner's conviction on the improper closing argument alone. Rather, the court looked to a number of errors appearing on the record considered

as a whole.[12] We employ the same procedure in the instant case. The pretrial publicity that clouded the issue of appellant's mental responsibility and the closing argument of the government worked in concert to deprive appellant of his right to a fair and impartial trial. The general rule that a cautionary instruction from the bench can in some circumstances overcome otherwise reversible error,[13] *see United States v. Troise*, 5 Cir. 1973, 483 F.2d 615, *cert. denied*, 414 U.S. 1066, 94 S.Ct. 574, 38 L.Ed.2d 471; *United States v. Kidd*, 5 Cir. 1971, 446 F.2d 1385; *Hill v. United States*, 5 Cir. 1966, 363 F.2d 176; *Conner v. United States*, 5 Cir. 1963, 322 F.2d 647, *cert. denied*, 1964, 377 U.S. 907, 84 S.Ct. 1167, 12 L.Ed.2d 178, has no application in a case such as this where the remark is so highly prejudicial—in light of all of the circumstances—as to be incurable. Conceivably the passage of time has diminished the public attention focused on appellant and the Murphy kidnapping. On remand, the district court should nevertheless again consider the advisability of transferring appellant's case pursuant to Rule 21(a) in light of the concerns discussed above.

12. In the *Bruce* case, the prejudicial comments of the prosecutor were joined by a general confusion of the issues and the use of an improper standard of mental responsibility by the state court. 483 F.2d at 1042. On oral argument, the government contended that *Bruce* was distinguishable from the instant case because the prejudicial comments by the state prosecutor in *Bruce* were in fact untrue. Given that our concern is with the impact on the minds of the jurors, the objective truth or falsity of the prejudicial remarks is immaterial.

13. The cautionary instruction given by the trial judge in the instant case immediately followed the objections of defense counsel to the argument made by the government.

Now, ladies and gentlemen of the jury, the argument of the United States Attorney or the assistant United States Attorney that was being made immediately prior to your being excused from the courtroom was very improper. You should not consider that argument, that is, the consequences of any verdict you might render. As I told you in the beginning, you are the triers of fact and you must determine guilt or not guilt of the

defendant from the evidence you have heard, and without regard to the consequences of your verdict. You are only responsible for the truth of your verdict, regardless of what the consequences might be. Completely disregard anything he said in that regard prior to your being excused. Do not draw any inferences from any statements made by the Government. The Court feels that the Attorney for the United States should be admonished in the presence of the jury for his conduct in arguing such to the jury.

Record on Appeal, Vol. XII at 1927–28. Whatever may be the benefit of a cautionary instruction in other contexts, the benefit is questionable where closing argument is "calculated to make such an impression on the jury that no direction from the court, however strong, can eliminate the prejudice thereby created, . . . ." *Helton v. United States*, 5 Cir. 1955, 221 F.2d 338, 341. *See Fiswick v. United States*, 1946, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196; *Mora v. United States*, 5 Cir. 1951, 190 F.2d 749. We view the closing argument employed by the government as calculated to create such an effect.

As a final and unrelated matter, appellant argues that principles of merger preclude his multiple convictions. We have examined this contention and find it without merit. Unlike the facts before the court in *United States v. Soria*, 5 Cir. 1975, 519 F.2d 1060, appellant here actually employed his weapon in the commission of the other offenses charged in the indictment. Thus, prosecution under 18 U.S.C. § 924(c)(1) was permissible. Similarly, 18 U.S.C. § 1951 and § 876 detail separate offenses, and appellant's prosecution under both statutes does not offend principles of merger.

The conviction is reversed and remanded for new trial.