UNITED STATES of America, Plaintiff,

v.

Walter Leroy MOODY, Jr., Defendant.

No. 1–90–Cr. 383.

United States District Court,
N.D. Georgia,
Atlanta Division.

April 9, 1991.

**1486**

Louis Freeh and Howard M. Shapiro, Sp. Asst. U.S. Attys., N.D. Ga., for U.S.

Edward D. Tolley, Cook, Noell, Tolley & Aldridge, Athens, Ga., and Donald F. Samuel, Garland & Samuel, Atlanta, Ga., for defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO TRANSFER TRIAL VENUE

DEVITT, District Judge, Sitting by Designation.

### Introduction

Defendant, charged in a 72–count superseding indictment with, *inter alia*, the December, 1989 mail-bomb deaths of Eleventh Circuit United States Court of Appeals Judge Robert S. Vance and Savannah alderman and civil rights attorney Robert E. Robinson, moves under Federal Rule of Criminal Procedure 21(a) for transfer of venue claiming there is so much prejudice against him in this district that he cannot obtain a fair trial here. For the reasons set forth below, the court grants defendant's motion to transfer trial venue.

### Discussion

Fed.R.Crim.P. 21(a) provides that upon motion of the defendant, the court "*shall* transfer the proceeding as to that defendant to another district * * * if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial * * * in that district." (emphasis supplied).

Defendant must receive a fair trial consistent with constitutional due process. *Sheppard v. Maxwell*, 384 U.S. 333, 335, 86 S.Ct. 1507, 1508, 16 L.Ed.2d 600 (1966). Two Fifth Circuit Court of Appeals decisions are helpful in fixing the due process standards to be followed, *Pamplin v. Mason*, 364 F.2d 1 (5th Cir.1966) and *United States v. Williams*, 523 F.2d 1203 (5th Cir. 1975). Also, the United States Supreme Court, in the exercise of its supervisory powers, has furnished the court specific guidance on this issue. *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

In *Pamplin*, Judge John Minor Wisdom reviewed the then-recent five U.S. Supreme Court opinions dealing with prejudicial publicity and fair trial/free press issues,[1] and concluded that the test was no longer "whether prejudice found its way into the jury box at the trial," thus requiring a showing of prejudice at voir dire. *Pamplin*, 364 F.2d at 5. Judge Wisdom wrote:

> As we read the Supreme Court cases, the test is: Where outside influences affecting the community's climate of opinion as to a defendant are inherently suspect, the resulting probability of unfairness requires suitable safeguards, such as change of venue, to assure a fair and impartial trial.

*Id.*

*Williams* was an appeal from a criminal conviction in the Northern District of Geor-

---

1. The quintet of fair trial/free press cases includes *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Rideau v. State of Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Turner v. State of Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Estes v. State of Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

gia. The trial judge held in abeyance the Rule 21(a) change of venue motion pending conclusion of voir dire. Trial proceeded and conviction followed. Upon examination of the entire record the Fifth Circuit granted a new trial based on the intense adverse pretrial publicity and the government's prejudicial closing argument. *Williams* closely follows the *Pamplin* decision and quotes extensively from it. Much of the publicity in *Williams,* tried in Atlanta, was carried in the Atlanta Journal–Constitution. A footnote in the opinion refers to those newspapers, each with a circulation in excess of 200,000, as the "leading newspapers" in the metropolitan Atlanta area and of unquestioned influence. *Williams,* 523 F.2d at 1205 n. 2 (noting as significant the trial court's description of the Atlanta Journal–Constitution as "cover[ing] Dixie like the Dew").

The pertinent ABA Standard for Criminal Justice also recommends ruling on a change of venue motion whenever it is determined there is a substantial likelihood that dissemination of prejudicial material will prevent a fair trial. A voir dire showing is not required. The standard reads:

> A motion for change of venue or continuance shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a substantial likelihood that, in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or on the court's own evaluation of the nature, frequency and timing of the material involved. A showing of actual prejudice shall not be required.

ABA Standard for Criminal Justice, 2nd Ed.1980 § 8–33(c).

■ The court interprets the above authorities to require that a motion for change of venue be granted whenever: (1) the court "is satisfied" of the existence of great prejudice; (2) outside influences affecting the community's opinion as to defendant are "inherently suspect"; (3) there is "reasonable likelihood that prejudicial news prior to trial will prevent a fair trial;" or (4) there is "substantial likelihood" a fair trial cannot be had in the absence of transfer.

■ Under each of these formulations of the standard, it appears that there exists in this district so great a prejudice against defendant that he cannot obtain a fair and impartial trial here. The defendant, a native of Rex, Georgia, in the Atlanta area, has a substantial criminal record and has had a long-running and continuing quarrel with the courts—particularly the federal courts in the Eleventh Circuit. His record and activities have been widely reported in the Georgia area for many years and particularly since the mail bomb deaths in December, 1989 of Eleventh Circuit Judge Vance and Savannah alderman and civil rights attorney Robinson. Defendant was an early suspect in the case and the publicity about him then increased substantially and much of it became prejudicial to the conduct of a fair trial in the Georgia area. His indictment in this case, filed on November 7, 1990, occasioned another new surge of adverse publicity.

During the investigation of this case, defendant was charged in a separate indictment in the Middle District of Georgia with obstruction of justice and other federal crimes. Because of the wide circulation of prejudicial publicity about him in that district, the presiding United States District Judge granted defendant's Rule 21(a) motion for transfer to another district for trial. Defendant was tried and convicted of these charges in December, 1990. This trial, too, was widely reported in the Georgia media and elsewhere, and in connection with the news stories about it, the upcoming trial in Atlanta on the bombing charges was extensively discussed.

This case has caused wide public interest not only in the south but nationally. The New York Times reported on November 7, 1990, that:

> The bombing sent a shudder of fear through the deep south and stirred strong suspicion that racial animosities had motivated them.

Most print news coverage was furnished by the Atlanta Journal and Constitution, but Cox News Service, Knight–Ridder News Service, the American Bar Journal and other services and newspapers originated, and carried, news of these events.

Defendant's former counsel, claiming the indictment charges "... an all-out assault on the federal judiciary" early on moved the disqualification of all federal judges to hear the case and appointment by the Senate Judiciary Committee of an "independent judicial officer" to preside over the trial. While the "Rule of Necessity," *United States v. Will,* 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980), would not permit of such action, all judges of the United States Court of Appeals for the Eleventh Circuit voluntarily recused themselves from the case. All eleven federal district judges and all magistrate judges of the Northern District of Georgia have now done the same. Previously all three judges in the Middle District of Georgia voluntarily recused themselves from defendant's case venued in that district.

The matter properly may be considered an important and unique case. The return of the indictment was announced in Washington, D.C. by Attorney General Dick Thornburgh and FBI Director William S. Sessions, a signal indication of a "big case." [2] The investigation took eleven months and federal agents spent more than 140,000 hours in their work. The indictment, consisting of 72 counts, has six counts providing punishment of life imprisonment. It is the kind of criminal trial which understandably commands a wide public following, particularly in the region where the crimes were carried out.

The court undertakes to describe briefly some of the prejudicial publicity. [3] Even before the indictment was returned, an F.B.I. agent predicted the evidence was so extensive and convincing that defendant Moody would be indicted and convicted. The Atlanta Journal and Constitution reported on November 8, 1990 in an article by Gail Epstein, staff writer, that:

Hours before the indictment, an F.B.I. agent told NAACP Regional Director Earl Shinhoster that *'Moody is the guy who did it!,* said Mr. Shinhoster: *I think they have enough evidence not only to indict, but to convict Moody.'* (emphasis supplied).

Statements of this kind violate the principles established by the United States Supreme Court's quintet of fair trial/free press decisions cited in footnote 1, *supra* and the Department of Justice's own rules prohibiting release of inappropriate information about pending criminal cases. *Katzenbach Rules,* 28 C.F.R. § 50.2, issued April 16, 1965. Specifically prohibited are "subjective observations" of guilt as described in the above example, and all information likely to influence the outcome of a future trial. § 50.2(b)(2)–(6).

Further violations of defendant's rights are reflected in the Atlanta Journal and Constitution for November 8, 1990. It is reported that:

Much of the evidence against Moody is circumstantial. But *investigators say such cases are frequently successful* because they are built from interlocking pieces and do not depend on a single 'smoking gun.' (emphasis supplied).

Another article reads:

This is a coffin that has a thousand nails in it, a *federal law enforcement official*

---

**2.** Attorney General Thornburgh congratulated those working on the case for their "tenacious commitment to solving this case, which strikes at the heart of our American concept of the rule of law." FBI Director Sessions said the indictment was the "result of one of the most intensive investigations ever conducted in this country."

**3.** The court has read more than 458 representative news articles about defendant and this case as printed in twelve newspapers published in the Northern District of Georgia. Copies of these articles are filed in five volumes as a supplement to defendant's motion for change of venue [clerk's entry 57]. The court notes that the government has withdrawn its objection to defendant's transfer motion. Thus, the court need not consider defendant's further evidence regarding television and radio coverage and media expert opinions. The hearing on this motion scheduled to take place in Atlanta on Tuesday, April 16 is cancelled.

*said* of the case against Moody. (emphasis supplied).

Other numerous articles not cited by the court reflect similar violations of defendant's rights based on information which originated with federal investigators. The stories normally recite a disclaimer of source such as "who spoke on condition he not be named." The court footnotes additional examples below.[4]

As the investigation progressed, and before indictment, so much of the evidence against defendant had been made available to the media that an unnamed federal judge was quoted by the Knight–Ridder News Service on August 21, 1980 as warning of the harm from such disclosures:

A federal judge complained that loud-mouth investigators were endangering any defendant's opportunity for a fair trial.

By early November, 1990, the Atlanta Journal and Constitution had accumulated the potential evidence against defendant and published it on November 8, 1990, under a large banner headline reading:

# Here's evidence against Moody

The article contained a 14–paragraph summary of the evidence against defendant arranged in separate columns as PHYSICAL and CIRCUMSTANTIAL. The article states that the information was obtained from interviews, presumably with federal investigative agents, and court documents. The news article is reproduced in the footnote.[5]

**4.** *"Federal investigators said today* that among other evidence against Mr. Moody were witnesses' statements, typewritten documents and information obtained through surveillance that one investigator said involved 'technical methods.' " *New York Times,* Nov. 7, 1990 (story by David Johnston) (emphasis supplied).

"He (Ted Banks, friend of Mrs. Moody) was not very forthcoming but he may be more cooperative now *said another investigator who also spoke on condition of anonymity." New York Times,* Nov. 21, 1990 (story by Donald Smathers) (emphasis supplied).

**5.** **"Here's evidence against Moody"**

The potential evidence against Walter Leroy Moody Jr. is both physical and circumstantial. According to court documents and interviews, it includes:
**Physical**
• The four December pipe bombs shared more than a dozen characteristics, some very unusual, with a pipe bomb Moody was convicted of having in 1972.
Federal records cataloging more than 10,-000 explosive devices revealed no others built using square metal-end plates with threaded rods extending from plate to plate within the pipe and secured with nuts.
• A pipe with holes drilled through the center of its end caps was discovered in a Chamblee apartment Moody rented. The FBI says the device "represents the initial stages in the construction of a pipe bomb" and used components and construction similar to those used for the December pipe bombs. The owner of the basement apartment said the unit, which Moody used for storage, was kept unlocked.

• Two .38–caliber CCI bullets were found in Moody's truck. The bombs contained CCI brand primer, an ammunition component.
Moody, a convicted felon, is not allowed to own firearms.
• An automatic letter-folding machine was found in Moody's house. The threat letters mailed to 11th Circuit judges and other victims were folded in a uniform manner, apparently on a machine.
• Pipes, rods, nails, glue, paint and other items used in the bombs were found in Moody's home, storage warehouse and an airplane hangar he uses.
**Circumstantial**
• Moody's former attorney, Michael Ford, worked at the same law firm as Robert Robinson, one of the bombing victims.
• The typewriter used to type labels on the bomb packages and threat letters to judges of the 11th U.S. Circuit Court of Appeals has been matched with a typewriter allegedly purchased by Moody's wife, Susan, in Enterprise, Ala. The typewriter has not been found.
• A gun-shop employee picked Moody out of a lineup as the man he sold a large quantity of smokeless gunpowder and ammunition components to last year; both items he sold were the specific types used in the mail bombs.
• Moody has spent 18 years appealing his 1972 conviction for possessing a pipe bomb that injured his ex-wife, and has been unsuccessful several times in the 11th Circuit. He also has filed numerous lawsuits. Prosecutors argue he is obsessed by his anger against the 11th Circuit and the legal system.
• Terminology in Moody's legal and business correspondence uses phrases similar to

From examination of the media coverage cited by defendant, the court finds that there has been inordinate, widespread, and prejudicial publicity concerning this case and that government agents have been responsible for much of it. The court concludes that defendant is entitled to a venue transfer.

 The court finds further support for a venue transfer in the context of the Supreme Court's exercise of its supervisory powers. Federal appellate courts exercise supervisory power over federal district courts in their administration of the federal criminal laws, *Bruno v. United States*, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939), and in this capacity have provided an even more exacting fairness standard on this issue. The Supreme Court in *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), in the exercise of its supervisory powers, granted a new trial to defendant when news accounts of defendant's criminal record reached some of the jurors. The trial judge had found such evidence inadmissible. The United States Supreme Court said:

> The prejudice to defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is part of the prosecutions evidence * * * It may indeed be greater for it is then not tempered by protected procedures.
>
> In the exercise of our supervisory powers to apply proper standards for enforcement of the criminal laws in the Federal courts, * * * we think a new trial should be granted.[6]

Here, much prejudicial information has reached the public through news accounts detailing defendant's past criminal record; defendant's conviction in the obstruction of justice trial in December, 1990; defendant's reliance on the insanity defense in that trial; the government's evidence against defendant; and statements of federal investigating officers concerning defendant's guilt.

Mr. Justice Black has said that "our system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). We should do so here.

Defendant has made a proper showing under the established due process standards that there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, and a strong showing under the Supreme Court's "supervisory standard" that he is entitled to a change of venue. The court will grant the motion.

 It appears to the court that a new place should be a district well outside of the normal range of Atlanta media coverage in order to obtain jurors least influenced by past adverse publicity.

Another factor to consider is the size of the community to which transfer is made. "Several courts have suggested that a venue change is usually more effective if it is to a more, rather than less, metropolitan community because a big case in a small town quickly becomes a *cause celebre* and the focus for substantially more publicity than existed at the time the decision to transfer was made...." *United States v. Chapin*, 515 F.2d 1274, 1288 (D.C.Cir.1975) *cert. denied*, 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *see, United States v. Dioguardi*, 428 F.2d 1033, 1039 (2d Cir. 1970), *cert. denied*, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54.

---

those found in letters sent by the mail bomber to federal judges, WAGA anchor Brenda Wood, the NAACP and television stations.
• Moody took chemistry and physics courses at Mercer University in Macon, and attended John Marshall Law School for several semesters.
• Moody apparently knows the postal system well, because of his mail-order literary consulting service.

**6.** The United States Supreme Court has declined to apply the so-called *Marshall* standard to an appeal from a state court ruling. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). But Chief Justice Burger, in a concurring opinion, said that he would have voted for a new trial had the case come to the court on appeal from a Federal court trial, *Id.*, 421 U.S. at 803–04, 95 S.Ct. at 2038, thus reflecting the more demanding standard of fairness in appeals from the federal trial courts.

Another consideration is that there be several (preferably daily) non-stop flights between the city chosen and Atlanta as well as between the city chosen and the Washington–New York area from which most of the witnesses will come. A new place should further offer adequate security and a convenient place for lodging defendant and witnesses in custody as needed. Obviously, it is also necessary to choose a community where United States court facilities are readily available. This requirement is the most difficult to meet in view of overloaded court dockets in major metropolitan areas.

■ With the assistance of the Circuit Court Executives in the Fourth, Sixth, Seventh and Eighth Circuits, court and counsel have surveyed the availability of court facilities responsive to requirements for this case. The only suitable available courtroom is in Minnesota, and that is so only because we are able to use the standard trial courtroom regularly assigned to this court in St. Paul.

In addition, the Twin Cities are well served by non-stop air service to and from Atlanta six times each day and to the New York–Washington D.C. area many times daily to accommodate witnesses and counsel. The Twin Cities area has a population of 2.4 million and is far enough removed from the Atlanta media coverage to provide reasonable assurance of the availability of jurors having little, if any, prior knowledge about the case. The United States Marshal for the District of Minnesota is well equipped to afford adequate security services and the nearby Minnesota State Prison can afford maximum lodging facilities for defendant and witnesses in custody as needed.