Justice Sotomayor,
with whom
Justice Stevens and Justice Breyer join, concurring in part and dissenting in part.
I concur in the Court’s resolution of the honest-services fraud question and join Part III of its opinion. I respectfully dissent, however, from the Court’s conclusion that Jeffrey Skilling received a fair trial before an impartial jury. Under our relevant precedents, the more intense the public’s antipathy toward a defendant, the more careful a court must be to prevent that sentiment from tainting the jury. In this case, passions ran extremely high. The sudden collapse of Enron directly affected thousands of people in the Houston area and shocked the entire community. The accompanying barrage of local media coverage was massive in volume and often caustic in tone. As Enron’s one-time chief executive officer (CEO), Skilling was at the center of the storm. Even if these extraordinary circumstances did not constitutionally compel a change of venue, they required the District Court to conduct a thorough voir dire in which prospective jurors’ attitudes about the case were closely scrutinized. The District Court’s inquiry lacked the necessary thoroughness and left serious doubts about whether the jury empaneled to decide Skilling’s case was capable of rendering an impartial decision based solely on the evidence presented in the courtroom. Accordingly, I would grant Skilling relief on his fair-trial claim.
*428 I
The majority understates the breadth and depth of community hostility toward Skilling and overlooks significant deficiencies in the District Court’s jury selection process. The failure of Enron wounded Houston deeply. Virtually overnight, what had been the city’s “largest, most visible, and most prosperous company,” its “foremost social and charitable force,” and “a source of civic pride” was reduced to a “shattered shell.” App. ¶¶ 11, 13, pp. 649a-650a, 1152a. Thousands of the company’s employees lost their jobs and saw their retirement savings vanish. As the effects rippled through the local economy, thousands of additional jobs disappeared, businesses shuttered, and community groups that once benefited from Enron’s largesse felt the loss of millions of dollars in contributions. See, e. g., 3 Supp. Record 1229, 1267; see also 554 F. 3d 529, 560 (CA5 2009) (“Accounting firms that serviced Enron’s books had less work, hotels had more open rooms, restaurants sold fewer meals, and so on”). Enron’s community ties were so extensive that the entire local U. S. Attorney’s Office was forced to recuse itself from the Government’s investigation into the company’s fall. See 3 Supp. Record 608 (official press release).
With Enron’s demise affecting the lives of so many Houstonians, local media coverage of the story saturated the community. According to a defense media expert, the Houston Chronicle — the area’s leading newspaper — assigned as many as 12 reporters to work on the Enron story full time. App. 568a-569a. The paper mentioned Enron in more than 4,000 articles during the 3-year period following the company’s December 2001 bankruptcy filing. Hundreds of these articles discussed Skilling by name. See 3 Supp. Record 2114. Skilling’s expert, a professional journalist and academic with 30 years’ experience, could not “recall another instance where a local paper dedicated as many resources to a single topic over such an extended period of time as the Houston Chronicle . . . dedicated to Enron.” App. ¶32, at 570a. *429 Local television news coverage was similarly pervasive and, in terms of “editorial theme,” “largely followed the Chronicle’s lead.” Id., ¶ 11, at 559a; see also id., at 717a. Between May 2002 and October 2004, local stations aired an estimated 19,000 news segments involving Enron, more than 1,600 of which mentioned Skilling. 3 Supp. Record 2116.
While many of the stories were straightforward news items, many others conveyed and amplified the community’s outrage at the top executives perceived to be responsible for the company’s bankruptcy. A Chronicle report on Skilling’s 2002 testimony before Congress is typical of the coverage. It began, “Across Houston, Enron employees watched former chief executive Jeffrey Skilling’s congressional testimony on television, turning incredulous, angry and then sarcastic by turns, as a man they knew as savvy and detail-oriented pleaded memory failure and ignorance about critical financial transactions at the now-collapsed energy giant.” App. 1218a. “‘He is lying; he knew everything,’ said [an employee], who said she had seen Skilling frequently over her 18 years with the firm, where Skilling was known for his intimate grasp of the inner doings at the company. T am getting sicker by the minute.’” Id., at 1219a. A companion piece quoted a local attorney who called Skilling an “idiot” who was “in denial”; he added, “I’m glad [Skilling’s] not my client.” Id., at 592a-593a (internal quotation marks omitted).
Articles deriding Enron’s senior executives were juxtaposed with pieces expressing sympathy toward and solidarity with the company’s many victims. Skilling’s media expert counted nearly a hundred victim-related stories in the Chronicle, including a “multi-page layout entitled ‘The Faces of Enron,’” which poignantly described the gut-wrenching experiences of former employees who lost vast sums of money, faced eviction from their homes, could not afford Christmas gifts for their children, and felt “scared,” “hurt,” “humiliat[ed],” “helpless,” and “betrayed.” Id., ¶ 71, at *430 585a-586a. The conventional wisdom that blame for Enron’s devastating implosion and the ensuing human tragedy ultimately rested with Skilling and former Enron Chairman Kenneth Lay became so deeply ingrained in the popular imagination that references to their involvement even turned up on the sports pages: “If you believe the story about [Coach Bill Parcells] not having anything to do with the end of Emmitt Smith’s Cowboys career, then you probably believe in other far-fetched concepts. Like Jeff Skilling having nothing to do with Enron’s collapse.” 3 Supp. Record 811.
When a federal grand jury indicted Skilling, Lay, and Richard Causey — Enron’s former chief accounting officer— in 2004 on charges of conspiracy to defraud, securities fraud, and other crimes, the media placed them directly in their crosshairs. In the words of one article, “there was one thing those whose lives were touched by the once-exalted company all seemed to agree upon: The indictment of former Enron CEO Jeff Skilling was overdue.” App. 1393a. Scoffing at Skilling’s attempts to paint himself as “a ‘victim’ of his subordinates,” id., at 1394a, the Chronicle derided “the doofus defense” that Lay and Skilling were expected to offer, id., at 1401a.[1] The Chronicle referred to the coming Skilling/Lay trial as “the main event” and “The Big One,” which would *431 finally bring “the true measure of justice in the Enron saga.” Record 40002; App. 1457a, 1460a.[2] On the day the superseding indictment charging Lay was issued, “the Chronicle dedicated three-quarters of its front page, 2 other full pages, and substantial portions of 4 other pages, all in the front or business sections, to th[e] story.” Id., ¶ 57, at 580a-581a.
Citing the widely felt sense of victimhood among Houstonians and the voluminous adverse publicity, Skilling moved in November 2004 for a change of venue.[3] The District Court denied the motion, characterizing the media coverage as largely “objective and unemotional.” App. to Brief for United States 11a. Voir dire, it concluded, would provide an effective means to “ferret out any bias” in the jury pool. Id., at 18a; see ante, at 370.
To that end, the District Court began the jury selection process by mailing screening questionnaires to 400 prospective jurors in November 2005. The completed questionnaires of the 283 respondents not excused for hardship dramatically illustrated the widespread impact of Enron’s collapse on the Houston community and confirmed the intense animosity of Houstonians toward Skilling and his co-defendants. More than one-third of the prospective jurors (approximately 99 of 283, by my count) indicated that they *432 or persons they knew had lost money or jobs as a result of the Enron bankruptcy. Two-thirds of the jurors (about 188 of 283) expressed views about Enron or the defendants that suggested a potential predisposition to convict. In many instances, they did not mince words, describing Skilling as “smug,” “arrogant,” “brash,” “conceited,” “greedy,” “deceitful,” “totally unethical and criminal,” “a crook,” “the biggest liar on the face of the earth,” and “guilty as sin” (capitalization omitted).[4] Only about 5 percent of the prospective jurors (15 of 283) did not read the Houston Chronicle, had not otherwise “heard or read about any of the Enron cases,” Record 13019, were not connected to Enron victims, and gave no answers suggesting possible antipathy toward the defendants.[5]
[6]The parties jointly stipulated to the dismissal *433 of 119 members of the jury pool for cause, hardship, or disability, but numerous individuals who had made harsh comments about Skilling remained.[6]
On December 28, 2005, shortly after the questionnaires had been returned, Causey pleaded guilty. The plea was covered in lead newspaper and television stories. A front-page headline in the Chronicle proclaimed that “Causey’s plea wreaks havoc for Lay, Skilling.” Record 12049, n. 13; see also ibid, (quoting a former U. S. attorney who described the plea as “a serious blow to the defense”). A Chronicle editorial opined that “Causey’s admission of securities fraud . . . makes less plausible Lay’s claim that most of the guilty *434 pleas were the result of prosecutorial pressure rather than actual wrongdoing.” Id., at 12391.
With the trial date quickly approaching, Skilling renewed his change-of-venue motion, arguing that both the questionnaire responses and the Causey guilty plea confirmed that he could not receive a fair trial in Houston. In the alternative, Skilling asserted that “defendants are entitled to a more thorough jury selection process than currently envisioned by the [cjourt.” Id., at 12067. The court had announced its intention to question individual jurors at the bench with one attorney for each side present, and to complete the voir dire in a single day. See, e. g., id., at 11804-11805, 11808. Skilling proposed, inter alia, that defense counsel be afforded a greater role in questioning, id., at 12074; that jurors be questioned privately in camera or in a closed courtroom where it would be easier for counsel to consult with their colleagues, clients, and jury consultants, id., at 12070-12072; and that the court “avoid leading questions,” which “tend to [ejlicit affirmative responses from prospective jurors that may not reflect their actual views,” id., at 12072. At a minimum, Skilling asserted, the court should grant a continuance of at least 30 days and send a revised questionnaire to a new group of prospective jurors. Id., at 12074-12075.
The District Court denied Skilling’s motion without a hearing, stating in a brief order that it was “not persuaded that the evidence or arguments urged by defendants . . . establish that pretrial publicity and/or community prejudice raise a presumption of inherent jury prejudice.” Id., at 14115. According to the court, the “jury questionnaires sent to the remaining members of the jury panel and the court’s voir dire examination of the jury panel provide adequate safeguards to defendants and will result in the selection of a fair and impartial jury in this case.” Id., at 14115-14116. The court did agree to delay the trial by two weeks, until January 30, 2006.
*435 The coming trial featured prominently in local news outlets. A front-page, eve-of-trial story in the Chronicle described “the hurt and anger and resentment” that had been “churn[ing] inside” Houstonians since Enron’s collapse. Id., at 39946. Again criticizing Lay and Skilling for offering a “doofus defense” (“a plea of not guilty by reason of emptyheadedness”), the paper stated that “Lay and Skilling took hundreds of millions in compensation yet now fail to accept the responsibility that went with it.” Ibid. The article allowed that the defendants’ guilt, “though perhaps widely assumed, remains even now an assertion. A jury now takes up the task of deciding whether that assertion is valid.” Id., at 39947. The next paragraph, however, assured readers that “it’s normal for your skin to crawl when Lay or Skilling claim with doe-eyed innocence that they were unaware that something was amiss at Enron. The company’s utter failure belies the claim.” Ibid, (one paragraph break omitted); see also id., at 39904 (declaring that Lay and Skilling would “have to offer a convincing explanation for how executives once touted as corporate geniuses could be so much in the dark about the illegal activities and deceptive finances of their own company”).
It is against this backdrop of widespread community impact and pervasive pretrial publicity that jury selection in Skilling’s case unfolded. Approximately 160 prospective jurors appeared for voir dire at a federal courthouse located “about six blocks from Enron’s former headquarters.” 554 F. 3d, at 561. Addressing them as a group, the District Court began by briefly describing the case and providing a standard admonition about the need to be fair and impartial and to decide the case based solely on the trial evidence and jury instructions. The court then asked whether anyone had “any reservations about your ability to conscientiously and fairly follow these very important rules.” App. 815a. Two individuals raised their hands and were called forward *436 to the bench. One told the court that he thought Lay and Skilling “knew exactly what they were doing” and would have to prove their innocence. Id., at 818a-819a. The second juror, who had stated on his written questionnaire that he held no opinion that would preclude him from being impartial, declared that he “would dearly love to sit on this jury. I would love to claim responsibility, at least V12 of the responsibility, for putting these sons of bitches away for the rest of their lives.” Id., at 819a-820a. The court excused both jurors for cause.
The court proceeded to question individual jurors from the bench. As the majority recounts, ante, at 373-374, the court asked them a few general yes/no questions about their exposure to Enron-related news, often variations of, “Do you recall any particular articles that stand out that you’ve read about the case?” App. 850a. The court also asked about questionnaire answers that suggested bias, focusing mainly on whether, notwithstanding seemingly partial comments, the prospective jurors believed they “could be fair” and “put the government to its proof.” Id., at 852a. Counsel were permitted to follow up on issues raised by the court. The court made clear, however, that its patience would be limited, see, e. g., id., at 879a, and questioning tended to be brief— generally less than five minutes per person. Even so, it exposed disqualifying biases among several prospective jurors who had earlier expressed no concerns about their ability to be fair.[7]
*437 Once it identified 38 qualified prospective jurors, the court allowed the defense and Government to exercise their allotted peremptory challenges. This left 12 jurors and 4 alternates, who were sworn in and instructed, for the first time, “not [to] read anything dealing with this case or listen to any discussion of the case on radio or television or access any Internet sites that may deal with the case” and to “inform your friends and family members that they should not discuss with you anything they may have read or heard about this case.” Id., at 1026a. Start to finish, the selection process took about five hours.
Skilling’s trial commenced the next day and lasted four months. After several days of deliberations, the jury found Skilling guilty of conspiracy, 12 counts of securities fraud, 5 counts of making false representations to auditors, and 1 count of insider trading; it acquitted on 9 insider trading counts. The jury found Lay guilty on all counts.
On appeal, Skilling asserted that he had been denied his constitutional right to a fair trial before an impartial jury. Addressing this claim, the Court of Appeals began by disavowing the District Court’s findings concerning “community hostility.” There was, the court concluded, “sufficient inflammatory pretrial material to require a finding of presumed prejudice, especially in light of the immense volume of coverage.” 554 F. 3d, at 559. “[Prejudice was [also] inherent in an alleged co-conspirator’s well-publicized decision to plead guilty on the eve of trial.” Ibid. The Court of Appeals, moreover, faulted the District Court for failing to “consider the wider context.” Id., at 560. “[I]t was not enough for the court merely to assess the tone of the news reporting. The evaluation of the volume and nature of reporting is merely a proxy for the real inquiry: whether there could be a fair trial by an impartial jury that was not influenced by outside, irrelevant sources.” Ibid, (internal quotation marks and footnote omitted). According to the Court of Appeals, “[t]he district court seemed to overlook that the *438 prejudice came from more than just pretrial media publicity, but also from the sheer number of victims.” Ibid.
Having determined that “Skilling was entitled to a presumption of prejudice,” the Court of Appeals proceeded to explain that “the presumption is rebuttable,... and the government may demonstrate from the voir dire that an impartial jury was actually impanelled.” Id., at 561 (internal quotation marks omitted). Describing the voir dire as “exemplary,” “searching,” and “proper and thorough,” id., at 562, the court concluded that “[t]he government [had] met its burden of showing that the actual jury that convicted Skilling was impartial,” id., at 564-565. On this basis, the Court of Appeals rejected Skilling’s claim and affirmed his convictions.
II
The Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence “based on the evidence presented in court.” Irvin v. Dowd, 366 U. S. 717, 723 (1961); see also Sheppard v. Maxwell, 384 U. S. 333, 362 (1966). Community passions, often inflamed by adverse pretrial publicity, can call the integrity of a trial into doubt. In some instances, this Court has observed, the hostility of the - community becomes so severe as to give rise to a “presumption of [juror] prejudice.” Patton v. Yount, 467 U. S. 1025, 1031 (1984).
The Court of Appeals incorporated the concept of presumptive prejudice into a burden-shifting framework: Once the defendant musters sufficient evidence of community hostility, the onus shifts to the Government to prove the impartiality of the jury. The majority similarly envisions a fixed point at which public passions become so intense that prejudice to a defendant’s fair-trial rights must be presumed. The majority declines, however, to decide whether the presumption is rebuttable, as the Court of Appeals held.
*439 This Court has never treated the notion of presumptive prejudice so formalistically. Our decisions instead merely convey the commonsense understanding that as the tide of public enmity rises, so too does the danger that the prejudices of the community will infiltrate the jury. The underlying question has always been this: Do we have confidence that the jury’s verdict was “induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print”? Patterson v. Colorado ex rel. Attorney General of Colo., 205 U. S. 454, 462 (1907).
The inquiry is necessarily case specific. In selecting a jury, a trial court must take measures adapted to the intensity, pervasiveness, and character of the pretrial publicity and community animus. Reviewing courts, meanwhile, must assess whether the trial court’s procedures sufficed under the circumstances to keep the jury free from disqualifying bias. Cf. Murphy v. Florida, 421 U. S. 794, 799 (1975) (scrutinizing the record for “any indications in the totality of circumstances that petitioner’s trial was not fundamentally fair”). This Court’s precedents illustrate the sort of steps required in different situations to safeguard a defendant’s constitutional right to a fair trial before an impartial jury.
At one end of the spectrum, this Court has, on rare occasion, confronted such inherently prejudicial circumstances that it has reversed a defendant’s conviction “without pausing to examine ... the voir dire examination of the members of the jury.” Rideau v. Louisiana, 373 U. S. 723, 727 (1963). In Rideau, repeated television broadcasts of the defendant’s confession to murder, robbery, and kidnaping so thoroughly poisoned local sentiment as to raise doubts that even the most careful voir dire could have secured an impartial jury. A change of venue, the Court determined, was thus the only way to ensure a fair trial. Ibid.; see also 6 W. LaFave, J. Israel, N. King, & O. Kerr, Criminal Procedure § 23.2(a), p. 264 (3d ed. 2007) (hereinafter LaFave) (“The best reading *440 of Rideau is that the Court there recognized that prejudicial publicity may be so inflammatory and so. pervasive that the voir dire simply cannot be trusted to fully reveal the likely prejudice among prospective jurors”).
As the majority describes, ante, at 379-380, this Court reached similar conclusions in Estes v. Texas, 381 U. S. 532 (1965), and Sheppard, 384 U. S. 333. These cases involved not only massive pretrial publicity but also media disruption of the trial process itself. Rejecting the argument that the defendants were not entitled to relief from their convictions because they “ha[d] established no isolatable prejudice,” the Court described the “untoward circumstances” as “inherently suspect.” Estes, 381 U. S., at 542, 544. It would have been difficult for the jurors not to have been swayed, at least subconsciously, by the “bedlam” that surrounded themv Sheppard, 384 U. S., at 355. Criticizing the trial courts' failures “to protect the jury from outside influence,” id., at 358, the Court stressed that, “where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another [venue] not so permeated with publicity.” Id., at 363. Estes and Sheppard thus applied Rideau’s insight that in particularly extreme circumstances even the most rigorous voir dire cannot suffice to dispel the reasonable likelihood of jury bias.
Apart from these exceptional cases, this Court has declined to discount voir dire entirely and has instead examined the particulars of the jury selection process to determine whether it sufficed to produce a jury untainted by pretrial publicity and community animus. The Court has recognized that when antipathy toward a defendant pervades the community there is a high risk that biased jurors will find their way onto the panel. The danger is not merely that some prospective jurors will deliberately hide their prejudices, but also that, as “part of a community deeply hostile to the accused,”- “they may unwittingly [be] influ *441 enced” by the fervor that surrounds them. Murphy, 421 U. S., at 803. To ensure an impartial jury in such adverse circumstances, a trial court must carefully consider the knowledge and attitudes of prospective jurors and then closely scrutinize the reliability of their assurances of fairness. Cf. Morgan v. Illinois, 504 U. S. 719, 729 (1992) (“[Pjart of the guarantee of a defendant’s right to an impartial jury is an adequate voir dire to identify unqualified jurors”).
Irvin offers an example of a case in which the trial court’s voir dire did not suffice to counter the “wave of public passion” that had swept the community prior to the defendant’s trial. 366 U. S., at 728. The local news media had “extensively covered” the crimes (a murder spree), “arous[ing] great excitement and indignation.” Id., at 719 (internal quotation marks omitted). Following Irvin’s arrest, the press “blanketed” the community with “a barrage of newspaper headlines, articles, cartoons and pictures” communicating numerous unfavorable details about Irvin, including that he had purportedly confessed. Id., at 725. Nearly 90 percent of the 430 prospective jurors examined during the trial court’s voir dire “entertained some opinion as to guilt — ranging in intensity from mere suspicion to absolute certainty.” Id., at 727. Of the 12 jurors seated, 8 “thought petitioner was guilty,” although “each indicated that notwithstanding his opinion he could render an impartial verdict.” Id., at 727, 724.
Despite the seated jurors’ assurances of impartiality, this Court invalidated Irvin’s conviction for want of due process. “It is not required,” this Court declared, “that the jurors be totally ignorant of the facts and issues involved. ... It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.” Id., at 722-723. The Court emphasized, however, that a juror’s word on this matter is not decisive, particularly when “the build-up of prejudice [in the community] is clear *442 and convincing.” Id., at 725. Many of Irvin’s jurors, the Court noted, had been influenced by “the pattern of deep and bitter prejudice shown to be present throughout the community.” Id., at 727 (internal quotation marks omitted). The Court did not “doubt [that] each juror was sincere when he said that he would be fair and impartial to [Irvin], but... [w]here so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.” Id., at 728.
The media coverage and .community animosity in Irvin were particularly intense. In three subsequent cases, this Court recognized that high-profile cases may generate substantial publicity without stirring similar public passions. The jury selection process in such cases, the Court clarified, generally need not be as exhaustive as in a case such as Irvin. So long as the trial court conducts a reasonable inquiry into extrajudicial influences and the ability of prospective jurors to presume innocence and render a verdict based solely on the trial evidence, we would generally have no reason to doubt the jury’s impartiality.[8]
The first of these cases, Murphy, 421 U. S. 794, involved a well-known defendant put on trial for a widely publicized Miami Beach robbery. The state trial court denied his motion for a change of venue and during voir dire excused 20 of the 78 prospective jurors for cause. Distinguishing Irvin, this Court saw no indication in the voir dire of “such hostility to [Murphy] by the jurors who served in his trial as to suggest a partiality that could not be laid aside.” 421 U. S., at 800. Although some jurors “had a vague recollection of the robbery with which [Murphy] was charged and each had *443 some knowledge of [his] past crimes,” “none betrayed any belief in the relevance of [Murphy’s] past to the present case.” Ibid.; see also ibid., n. 4 (contrasting a juror’s “mere familiarity with [a defendant] or his past” with “an actual predisposition against him”). “[T]hese indicia of impartiality,” the Court suggested, “might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory, but the circumstances surrounding [Murphy’s] trial [were] not at all of that variety.” Id., at 802.
In a second case, Yount, 467 U. S. 1025, the defendant was granted a new trial four years after being convicted of murder. He requested a change of venue, citing pretrial publicity and the widespread local knowledge that he had previously been convicted and had made confessions that would be inadmissible in court. The state trial court denied Yount’s motion and seated a jury following a 10-day voir dire of 292 prospective jurors. Nearly all of the prospective jurors had heard of the case, and 77 percent “admitted they would carry an opinion into the jury box.” Id., at 1029. Declining to grant relief on federal habeas review, this Court stressed the significant interval between Yount’s first trial— when “adverse publicity and the community’s sense of outrage were at their height” — and his second trial, which “did not occur until four years later, at a time when prejudicial publicity was greatly diminished and community sentiment had softened.” Id., at 1032. While 8 of the 14 seated jurors and alternates had “at some time . . . formed an opinion as to Yount’s guilt,” the “particularly extensive” voir dire confirmed that “time had weakened or eliminated any” bias they once may have harbored. Id., at 1029-1030, 1034, n. 10, 1033. Accordingly, this Court concluded, “the trial court did not commit manifest error in finding that the jury as a whole was impartial.” Id., at 1032.
This Court most recently wrestled with the issue of pretrial publicity in Mu’Min v. Virginia, 500 U. S. 415 (1991). *444 Mu’Min stood accused of murdering a woman while out of prison on a work detail. Citing 47 newspaper articles about the crime, Mu’Min moved for a change of venue. The state trial court deferred its ruling and attempted to seat a jury. During group questioning, 16 of the 26 prospective jurors indicated that they had heard about the case from media or other sources. Dividing these prospective jurors into panels of four, the court asked further general questions about their ability to be fair given what they had heard or read. One juror answered equivocally and was dismissed for cause. The court refused Mu’Min’s request to ask more specific questions “relating to the content of news items that potential jurors might have read or seen.” Id., at 419. Of the 12 persons who served on the jury, “8 had at one time or another read or heard something about the case. None had indicated that he had formed an opinion about the case or would be biased in any way.” Id., at 421.
Rejecting Mu’Min’s attempt to analogize his case to Irvin, this Court observed that “the cases differ both in the kind of community in which the coverage took place and in extent of media coverage.” 500 U. S., at 429. Mu’Min’s offense occurred in the metropolitan Washington, D. C., area, “which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year.” Ibid. While the crime garnered “substantial” pretrial publicity, the coverage was not as pervasive as in Irvin and “did not contain the same sort of damaging information.” 500 U. S., at 429-430. Moreover, in contrast to Irvin, the seated jurors uniformly disclaimed having ever formed an opinion about the case. Given these circumstances, this Court rebuffed Mu’Min’s assertion that the trial court committed constitutional error by declining to “make precise inquiries about the contents of any news reports that potential jurors have read.” 500 U. S., at 424. The Court stressed, however, that its ruling was context specific: “Had the trial court in this case been confronted with the 'wave of public passion’ *445 engendered by pretrial publicity that occurred in connection with Irvin’s trial, the Due Process Clause of the Fourteenth Amendment might well have required more extensive examination of potential jurors than it undertook here.” Id., at 429.
Ill
It is necessary to determine how this case compares to our existing fair-trial precedents. Were the circumstances so inherently prejudicial that, as in Rideau, even the most scrupulous voir dire would have been “but a hollow formality” incapable of reliably producing an impartial jury? 373 U. S., at 726. If the circumstances were not of this character, did the District Court conduct a jury selection process sufficiently adapted to the level of pretrial publicity and community animus to ensure the seating of jurors capable of presuming innocence and shutting out extrajudicial influences?
A
Though the question is close, I agree with the Court that the prospect of seating an unbiased jury in Houston was not so remote as to compel the conclusion that the District Court acted unconstitutionally in denying Skilling’s motion to change venue. Three considerations lead me to this conclusion. First, as the Court observes, ante, at 382, the size and diversity of the Houston community make it probable that the jury pool contained a nontrivial number of persons who were unaffected by Enron’s collapse, neutral in their outlook, and unlikely to be swept up in the public furor. Second, media coverage of the case, while ubiquitous and often inflammatory, did not, as the Court points out, ante, at 382-383, contain a confession by Skilling or similar “smoking-gun” evidence of specific criminal acts. For many prospective jurors, the guilty plea of codefendant and alleged co-conspirator Causey, along with the pleas and convictions of other Enron executives, no doubt suggested guilt by association. But reasonable minds exposed to such information *446 would not necessarily have formed an indelible impression that Skilling himself was guilty as charged. Cf. Rideau, 373 U. S., at 726 (a majority of the county’s residents were “exposed repeatedly and in depth to the spectacle of Rideau personally confessing in detail to the crimes with which he was later to be charged”). Third, there is no suggestion that the courtroom in this case became, as in Estes and Sheppard, a “carnival” in which the “calmness and solemnity” of the proceedings were compromised. Sheppard, 384 U. S., at 358, 350 (internal quotation marks omitted). It is thus appropriate to examine the voir dire and determine whether it instills confidence in the impartiality of the jury actually selected.[9]
B
In concluding that the voir dire “adequately detected] and defuse[d] juror bias,” ante, at 385, the Court downplays the *447 extent of the community’s antipathy toward Skilling and exaggerates the rigor of the jury selection process. The devastating impact of Enron’s collapse and the relentless media coverage demanded exceptional care on the part of the District Court to ensure the seating of an impartial jury. While the procedures employed by the District Court might have been adequate in the typical high-profile case, they did not suffice in the extraordinary circumstances of this case to safeguard Skilling’s constitutional right to a fair trial before an impartial jury.
In conducting this analysis, I am mindful of the “wide discretion” owed to trial courts when it comes to jury-related issues. Mu’Min, 500 U. S., at 427; cf. ante, at 386-387. Trial courts are uniquely positioned to assess public sentiment and the credibility of prospective jurors. Proximity to events, however, is not always a virtue. Persons in the midst of a tumult often lack a panoramic view. “[Ajppellate tribunals [thus] have the duty to make an independent evaluation of the circumstances.” Sheppard, 384 U. S., at 362. In particular, reviewing courts are well qualified to inquire into whether a trial court implemented procedures adequate to keep community prejudices from infecting the jury. If the jury selection process does not befit the circumstances of the case, the trial court’s rulings on impartiality are necessarily called into doubt. See Morgan, 504 U. S., at 729-730 (“‘Without an adequate voir dire the trial judge’s responsibility to remove prospective jurors who will not be able impartially to follow the court’s instructions and evaluate the evidence cannot be fulfilled’ ” (quoting Rosales-Lopez v. United States, 451 U. S. 182, 188 (1981) (plurality opinion))); see also Mu’Min, 500 U. S., at 451 (Kennedy, J., dissenting) (“Our willingness to accord substantial deference to a trial court’s finding of juror impartiality rests on our expectation that the trial court will conduct a sufficient voir dire to determine the credibility of a juror professing to be impartial”).
*448 1
As the Court of Appeals apprehended, the District Court gave short shrift to the mountainous evidence of public hostility. For Houstonians, Enron’s collapse was an event of once-in-a-generation proportions. Not only was the volume of media coverage “immense” and frequently intemperate, but “the sheer number of victims” created a climate in which animosity toward Skilling ran deep and the desire for conviction was widely shared. 554 F. 3d, at 559-560.
The level of public animus toward Skilling dwarfed that present in cases such as Murphy and MuMin. The pretrial publicity in those cases consisted of dozens of news reports, most of which were “largely factual in nature.” Murphy, 421 U. S., at 802. There was no indication that the relevant communities had been captivated by the cases or had adopted fixed views about the defendants. In contrast, the number of media reports in this case reached the tens of thousands, and full-throated denunciations of Skilling were common. The much closer analogy is thus to Irvin, which similarly featured a “barrage” of media coverage and a “huge . . . wave of public passion,” 366 U. S., at 725, 728, although even that case did not, as here, involve direct harm to entire segments of the community.[10]
Attempting to distinguish Irvin, the majority suggests that Skilling’s economic offenses were less incendiary than Irvin’s violent crime spree and that “news stories about Enron contained nothing resembling the horrifying information rife in reports about Irvin’s rampage of robberies and murders.” Ante, at 394. Along similar lines, the District Court described “the facts of this case [as] neither heinous nor sensational.” App. to Brief for United States 10a. The majority also points to the four years that passed between *449 Enron’s declaration of bankruptcy and the start of Skilling’s trial, asserting that “the decibel level of media attention diminished somewhat” over this time. Ante, at 383. Neither of these arguments is persuasive.
First, while violent crimes may well provoke widespread community outrage more readily than crimes involving monetary loss, economic crimes are certainly capable of rousing public passions, particularly when thousands of unsuspecting people are robbed of their livelihoods and retirement savings. Indeed, the record in this case is replete with examples of visceral outrage toward Skilling and other Enron executives. See, e. g., Record 39946 (front-page, eve-of-trial story describing “the hurt and anger and resentment . . . ehurn[ing] inside” the people of Houston). Houstonians compared Skilling to, among other things, a rapist, an axe murderer, and an al Qaeda terrorist.[11] As one commentator observed, “[i]t’s a sign of how shocked Houstonians are about Enron’s ignominious demise that Sept. 11 can be invoked— and is frequently — to explain the shock of the company’s collapse.” 3 Supp. Record 544. The bad blood was so strong that Skilling and other top executives hired private security to protect themselves from persons inclined to take the law into their own hands. See, e. g., App. 1154a (“After taking the temperature of Enron’s victims, [a local lawyer] says the Enron executives are wise to take security precautions”).
*450 Second, the passage of time did little to soften community-sentiment. Contrary to the Court’s suggestion, ante, at 383, this case in no way resembles Yount, where, by the time of the defendant’s retrial, “prejudicial publicity [had] greatly diminished” and community animus had significantly waned. 467 U. S., at 1032; see also ibid, (in the months preceding the defendant’s retrial, newspaper reports about the case averaged “less than one article per month,” and public interest was “minimal”). The Enron story was a continuing saga, and “publicity remained intense throughout.” 554 F. 3d, at 560. Not only did Enron’s downfall generate wall-to-wall news coverage, but so too did a succession of subsequent Enron-related events.[12] Of particular note is the highly publicized guilty plea of codefendant Causey just weeks before Skilling’s trial. If anything, the time that elapsed between the bankruptcy and the trial made the task of seating an unbiased jury more difficult, not less. For many mem *451 bers of the jury pool, each highly publicized Enron-related guilty plea or conviction likely-served to increase their certainty that Skilling too had engaged in — if not masterminded — criminal acts, particularly given that the media' coverage reinforced this view. See supra, at 433-434. The trial of Skilling and Lay was the culmination of all that had come before. See Record 40002 (noting that “prosecutors followed the classic pattern of working their way up through the ranks”). As the Chronicle put it in July 2005, shortly after the trial of several Enron Broadband Services executives ended without convictions: “The real trial, the true measure of justice in the Enron saga, begins in January. Let the small fry swim free if need be. We’ve got bigger fish in need of frying.” App. 1460a (paragraph breaks omitted); see also ibid. (“From the beginning, the Enron prosecution has had one true measure of success: Lay and Skilling in a cold steel cage”).
Any doubt that the prevailing mindset in the Houston community remained overwhelmingly negative was dispelled by prospective jurors’ responses to the written questionnaires. As previously indicated, supra, at 431-433, more than one-third of the prospective jurors either knew victims of Enron’s collapse or were victims themselves, and two-thirds gave responses suggesting an antidefendant bias. In many instances their contempt for Skilling was palpable. See nn. 4, 6, supra. Only a small fraction of the prospective jurors raised no red flags in their responses. And this was before Causey’s guilty plea and the flurry of news reports that accompanied the approach of trial. One of Skilling’s experts, a political scientist who had studied pretrial publicity “for over 35 years” and consulted in more than 200 high-profile cases (in which he had recommended against venue changes more often than not), “c[a]me to the conclusion that the extent and depth of bias shown in these questionnaires is the highest or at least one of the very highest I have ever encountered.” App. ¶¶2, 7, at 783a, 785a (emphasis deleted).
*452 2
Given the extent of the antipathy evident both in the community at large and in the responses to the written questionnaire, it was critical for the District Court to take “strong measures” to ensure the selection of “an impartial jury free from outside influences.” Sheppard, 384 U. S., at 362. As this Court has recognized, “[i]n a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others’ protestations may be drawn into question.” Murphy, 421 U. S., at 803; see also Groppi v. Wisconsin, 400 U. S. 505, 510 (1971) (“ ‘[A]ny judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere’ ” (quoting Frank v. Mangum, 237 U. S. 309, 349 (1915) (Holmes, J., dissenting))). Perhaps because it had underestimated the public’s antipathy toward Skilling, the District Court’s 5-hour voir dire was manifestly insufficient to identify and remove biased jurors.[13]
*453 As an initial matter, important lines of inquiry were not pursued at all. The majority accepts, for instance, that “publicity about a codefendant’s guilty plea calls for inquiry to guard against actual prejudice.” Ante, at 385. Implying that the District Court undertook this inquiry, the majority states that “[o]nly two venire members recalled [Causey’s] plea.” Ibid. In fact, the court asked very few prospective jurors any questions directed to their knowledge of or feelings about that event.[14] Considering how much news the plea generated, many more than two venire members were likely aware of it. The lack'of questioning, however, makes the prejudicial impact of the plea on those jurors impossible to assess.
The court also rarely asked prospective jurors to describe personal interactions they may have had about the case, or to consider whether they might have difficulty avoiding discussion of the case with family, friends, or colleagues during the course of the lengthy trial. The tidbits of information that trickled out on these subjects provided cause for concern. In response to general media-related questions, several prospective jurors volunteered that they had spoken with others about the case. Juror 74, for example, indicated that her husband was the “news person,” that they had “talked about it,” that she had also heard things “from work,” and that what she heard was “all negative, of course.” App. 948a. The court, however, did not seek elaboration *454 about the substance of these interactions. Surely many prospective jurors had similar conversations, particularly once they learned upon receiving the written questionnaire that they might end up on Skilling’s jury.
Prospective jurors’ personal interactions, moreover, may well have left them with the sense that the community was-counting on a conviction. Yet this too was a subject the District Court did not adequately explore. On the few occasions when prospective jurors were asked whether they would feel pressure from the public to convict, they acknowledged that it might be difficult to return home after delivering a not-guilty verdict. Juror 75, for instance, told the court, “I think a lot of people feel that they’re guilty. And maybe they’re expecting something to come out of this trial.” Id., at 956a. It would be “tough,” she recognized, “to vote not guilty and go back into the community.” Id., at 957a; see also id., at 852a (Juror 10) (admitting “some hesitancy” about “telling people the government didn’t prove its case”).
With respect to potential nonmedia sources of bias, the District Court’s exchange with Juror 101 is particularly troubling.[15] Although Juror 101 responded in the negative when asked whether she had “read anything in the newspaper that [stood] out in [her] mind,” she volunteered that she “just heard that, between the two of them, [Skilling and Lay] had $48 million to contribute for their case and that there was an insurance policy that they could collect on, also.” Id., at 998a. This information, she explained, “was just something I overheard today — other jurors talking.” Ibid. It seemed suspicious, she intimated, “to have an insurance policy ahead of time.” Id., at 999a. The court advised her that “most corporations provide insurance for their officers and directors.” Ibid. The court, however, did not investigate the matter further, even though it had earlier instructed prospective jurors not to talk to each other about the case. Id., *455 at 843a. It is thus not apparent whether other prospective jurors also overheard the information and whether they too believed that it reflected unfavorably on the defendants; nor is it apparent what other outside information may have been shared among the venire members. At the very least, Juror 101’s statements indicate that the court’s questions were failing to bring to light the extent of jurors’ exposure to potentially prejudicial facts and that some prospective jurors were having difficulty following the court’s directives.
The topics that the District Court did cover were addressed in cursory fashion. Most prospective jurors were asked just a few yes/no questions about their general exposure to media coverage and a handful of additional questions concerning any responses to the written questionnaire that suggested bias. In many instances, their answers were unenlightening.[16] Yet the court rarely sought to draw them out with open-ended questions about their impressions of Enron or Skilling and showed limited patience for counsel’s followup efforts. See, e. g., id., at 879a, 966a.[17] When pro *456 spective jurors were more forthcoming, their responses tended to highlight the ubiquity and negative tone of the local news coverage, thus underscoring the need to press the more guarded members of the venire for further information.[18] Juror 17, for example, mentioned hearing a radio program that very morning in which a former Enron employee compared persons who did not think Skilling was guilty to Holocaust deniers. See id., at 863a (“[H]e said he thought that he would find them guilty automatically if he was on the jury because he said that it would be worse than a German trying to say that they didn’t kill the Jews”).[19] Other jurors may well have encountered, and been influenced by, similarly incendiary rhetoric.
These deficiencies in the form and content of the voir dire questions contributed to a deeper problem: The District Court failed to make a sufficiently critical assessment of prospective jurors’ assurances of impartiality. Although the Court insists otherwise, ante, at 392, the voir dire transcript indicates that the District Court essentially took jurors at *457 their word when they promised to be fair. Indeed, the court declined to dismiss for cause any prospective juror who ultimately gave a clear assurance of impartiality, no matter how much equivocation preceded it. Juror 29, for instance, wrote on her questionnaire that Skilling was “not an honest man.” App. 881a. During questioning, she acknowledged having previously thought the defendants were guilty, and she disclosed that she lost $50,000-$60,000 in her 401(k) as a result of Enron’s collapse. Id., at 880a, 883a. But she ultimately agreed that she would be able to presume innocence. Id., at 881a, 884a. Noting that she “blame[d] Enron for the loss of her money” and appeared to have “unshakeable bias,” Skilling’s counsel challenged her for cause. Id., at 885a. The court, however, declined to remove her, stating that “she answered candidly she’s going to have an open mind now” and “agreeing]” with the Government’s assertion that “we have to take her at her word.” Id., at 885a-886a.[20] As this Court has made plain, jurors’ assurances of impartiality simply are not entitled to this sort of talismanic significance. See, e. g., Murphy, 421 U. S., at 800 (“[T]he juror’s assurances *458 that he is equal to th[e] task cannot be dispositive of the accused’s rights”); Irvin, 366 U. S., at 728 (“Where so many, so many times, admi[t] prejudice, ... a statement of impartiality can be given little weight”).
Worse still, the District Court on a number of occasions accepted declarations of impartiality that were equivocal on their face. Prospective jurors who “hope[d]” they could presume innocence and did “not necessarily” think Skilling was guilty were permitted to remain in the pool. App. 932a, 857a. Juror 61, for instance, wrote of Lay on her questionnaire, “Shame on him.” Id., at 931a. Asked by the court about this, she stated that, “innocent or guilty, he was at the helm” and “should have known what was going on at the company.” Ibid.; see also id., at 934a (Skilling is “probably” “in the same boat as” Lay). The court then asked, “[C]an you presume, as you start this trial, that Mr. Lay is innocent?” Id., at 932a. She responded, “I hope so, but you know. I don’t know. I can’t honestly answer that one way or the other.” Ibid.; see also id., at 933a (“I bring in my past history. I bring in my biases. I would like to think I could rise above those, but I’ve never been in this situation before. So I don’t know how I could honestly answer that question one way or the other____I do have some concerns”). Eventually, however, Juror 61 answered “Yes” when the court asked if she would be able to acquit if she had “a reasonable doubt that the defendants are guilty.” Id., at 933a-934a. Challenging her for cause, defense counsel insisted that they had not received “a clear and unequivocal answer” about her ability to be fair. Ibid. The court denied the challenge, stating, “You know, she tried.” Ibid.
3
The majority takes solace in the fact that most of the persons actually seated as jurors and alternates “specifically stated that they had paid scant attention to Enron-related *459 news.” Ante, at 390-391, and n. 26.[21] In context, however, these general declarations reveal little about the seated jurors’ actual knowledge or views or the possible pressure they might have felt to convict, and thus cannot instill confidence that the jurors “were not under [the] sway” of the prevailing community sentiment. Cf. ante, at 391. Jurors who did not “get into details” of Enron’s complicated accounting schemes, App. 856a, nevertheless knew the outline of the oft-repeated story, including that Skilling and Lay had been cast as the leading villains. Juror 63, for instance, told the court that she “may have heard a little bit” about Enron-related litigation but had not “really pa[id] attention.” Id., at 935a. Yet she was clearly aware of some specifics. On her questionnaire, despite stating that she had not followed Enron-related news, she wrote about “whistleblowers and Arthur Andersen lying about Enron’s accounting,” and she expressed the view that Skilling and Lay “probably knew they were breaking the law.” Supp. App. 105sa-106sa. During questioning, which lasted barely four minutes, the District Court obtained no meaningful information about the actual extent of Juror 63’s familiarity with the ease or the basis for her belief in Skilling’s guilt. Yet it nevertheless accepted her assurance that she could “absolutely” presume innocence. App. 937a.[22]
*460 Indeed, the District Court’s anemic questioning did little to dispel similar doubts about the impartiality of numerous other seated jurors and alternates. In my estimation, more than half of those seated made written and oral comments suggesting active antipathy toward the defendants. The majority thus misses the mark when it asserts that “Skilling’s seated jurors . . . exhibited nothing like the display of bias shown in Irvin.” Ante, at 394. Juror 10, for instance, reported on his written questionnaire that he knew several co-workers who owned Enron stock; that he personally may have owned Enron stock through a mutual fund; that he heard and read about the Enron cases from the “Houston Chronicle, all three Houston news channels, Fox news, talking with friends [and] co-workers, [and] Texas Lawyer Magazine”; that he believed Enron’s collapse “was due to greed and mismanagement”; that “[i]f [Lay] did not know what was going on in his company, he was really a poor manager/ leader”; and that the defendants were “suspect.” Supp. App. llsa-19sa. During questioning, he said he “th[ought]” he could presume innocence and “believe[d]” he could put the Government to its proof, but he also acknowledged that he might have “some hesitancy” “in telling people the government didn’t prove its case.” App. 851a-852a.
Juror 11 wrote that he “work[ed] with someone who worked at Enron”; that he got Enron-related news from the “Houston Chronicle, Channel 2 News, Channel 13 News, O’Reilly Factor, [and] talking with friends and co-workers”; that he regularly visited the Chronicle Web site; that “greed on Enron’s part” caused the company’s collapse; and that “[a] lot of people were hurt financially.” Supp. App. 26sa-30sa. During questioning, he stated that he would have “no *461 problem” requiring the Government to prove its case, but he also told the court that he believed Lay was “greedy” and that corporate executives are often “stretching the legal limits ... . I’m not going to say that they’re all crooks, but, you know.” App. 857a, 854a. Asked whether he would “star[t] the case with sort of an inkling that because [Lay is] greedy he must have done something illegal,” he offered an indeterminate “not necessarily.” Id., at 857.[23]
*462 While several seated jurors and alternates did not make specific comments suggesting prejudice, their written and oral responses were so abbreviated as to make it virtually impossible for the District Court reliably to assess whether they harbored any latent biases. Juror 13, for instance, wrote on his questionnaire that he had heard about the Enron cases from the “[njews.” Supp. App. 42sa. The court questioned him for two minutes, during which time he confirmed that he had “heard what’s on the news, basically,” including “that the trial had moved from the 17th to the 31st.” He added that the story “was all over the news on every detail of Enron.” App. 858a-860a. No meaningful information about his knowledge or attitudes was obtained. Similarly, Juror 78 wrote that she had not followed Enron-related news but was aware that “[mjany people lost their jobs.” Supp. App. 151sa. The court questioned her for less than 90 seconds. During that time, she acknowledged that she had “caught glimpses” of the coverage and “kn[e]w gen-, erally, you know, that the company went bankrupt” and that there “were some employees that went off and did their own businesses.” App. 969a. Little more was learned.[24]
In assessing the likelihood that bias lurked in the minds of at least some of these seated jurors, I find telling the way in *463 which voir dire played out. When the District Court asked the prospective jurors as a group whether they had any reservations about their ability to presume innocence and put the Government to its proof, only two answered in the affirmative, and both were excused for cause. Id., at 815a-820a. The District Court’s individual questioning, though truncated, exposed disqualifying prejudices among numerous additional prospective jurors who had earlier expressed no concerns about their impartiality. See n. 7, supra. It thus strikes me as highly likely that at least some of the seated jurors, despite stating that they could be fair, harbored similar biases that a more probing inquiry would likely have exposed. Cf. Yount, 467 U. S., at 1034, n. 10 (holding that the trial court’s “particularly extensive” 10-day voir dire ensured the jury’s impartiality).[25]
The majority suggests, ante, at 383-384, 395, that the jury’s decision to acquit Skilling on nine relatively minor insider trading charges confirms its impartiality. This argument, however, mistakes partiality with bad faith or blind vindictiveness. Jurors who act in good faith and sincerely believe in their own fairness may nevertheless harbor disqualifying prejudices. Such jurors may well acquit where evidence is wholly lacking, while subconsciously resolving closer calls against the defendant rather than giving him the benefit of the doubt. Cf. United States v. McVeigh, 918 F. Supp. 1467, 1472 (WD Okla. 1996) (Prejudice “may go un *464 recognized in those who are affected by it. The prejudice that may deny a fair trial is not limited to a bias or discriminatory attitude. It includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence. That something has its most powerful effect if it generates strong emotional responses”). In this regard, it is significant that the Government placed relatively little emphasis on the nine insider trading counts during its closing argument, declining to explain its theory on those counts in any detail whatsoever. Record 37010. The acquittals on those counts thus provide scant basis for inferring a lack of prejudice.
* * *
In sum, I cannot accept the majority’s conclusion that voir dire gave the District Court “a sturdy foundation to assess fitness for jury service.” Cf. ante, at 395. Taken together, the District Court’s failure to cover certain vital subjects, its superficial coverage of other topics, and its uncritical acceptance of assurances of impartiality leave me doubtful that Skilling’s jury was indeed free from the deep-seated animosity that pervaded the community at large. “[RJegardless of the heinousness of the crime charged, the apparent guilt of the offenderf,] or the station in life which he occupies,” our system of justice demands trials that are fair in both appearance and fact. Irvin, 366 U. S., at 722. Because I do not believe Skilling’s trial met this standard, I would grant him relief.

 See also App. 735a (describing Enron as “hardball fraud” and noting that “Enron prosecutors have approached the case more like an organized crime investigation than a corporate fraud prosecution,” a “tactic [that] makes sense” given “the sheer pervasiveness of fraud, corruption and self-dealing”); id., at 1403a (“Lay stood proudly in front of Enron’s facade of success, while Skilling and his own prot[ege], [Andrew] Fastow, ginned up increasingly convoluted mechanisms for concealing the financial reality. ... A court will decide the particulars, but yes, Ken Lay knew”); id., at 1406a, 1409a (describing Enron’s collapse as “failure as a result of fraud” and criticizing Skilling for using “vitriol [as] a smokescreen” and “bolting for the door” just before Enron’s stock price plummeted); 3 Supp. Record 1711 (discussing the role of Skilling and Lay in “the granddaddy of all corporate frauds”).

 According to Skilling’s media expert, local television stations “adopted these same themes” and “dr[o]ve them home through such vivid and repeated visual imagery as replaying footage of Skilling’s . . . ‘perp walk’ when details about Skilling’s upcoming trial [we]re discussed.” App. ¶ 65, at 584a. During arraignment, news outlets “followed each man as he drove from his home to FBI headquarters, to the court, and back home, often providing 'color’ commentary — such as interviewing former Enron employees for comment on the day’s events.” Id., ¶ 60, at 581a.

 Reporting on the ehange-of-venue motion, the Chronicle described Skilling as a “desperate defendant,” and the Austin Ameriean-Statesman opined that while a change of venue may make sense “[fjrom a legal perspective,” “from the standpoint of pure justice, the wealthy executives really should be judged right where their economic hurricane struck with the most force.” Id., at 748a, 747a.

 See, e. g., Juror 1 (“Ken Lay and the others are guilty as all get out and ought to go to jail”; Skilling is “[b]rash, [a]rrogant [and] [e]oneeited”; “I find it morally awful that these people are still running loose”); Juror 70 (“Mr. Skilling is the biggest liar on the face of the earth”); Juror 163 (Skilling “would lie to his mother if it would further his cause”); Juror 185 (“I think [Skilling] was arrogant and a crook”); Juror 200 (Skilling is a “[s]killful [l]iar [and] crook” who did “a lot of the dirty work”; the defendants would “have to be blind, deaf, [and] stupid to be unaware of what was happening” (emphasis deleted)); Juror 206 (Skilling is “[t]otally unethical and criminal”; the defendants “are all guilty and should be reduced to having to beg on the corner [and] live under a bridge”); Juror 238 (“They are all guilty as sin — come on now”); Juror 299 (Skilling “initiated, designed, [and] authorized certain illegal actions”); Juror 314 (Lay “should 'fess up’ and take his punishment like a man”; “[t]he same goes for Jeffrey Skilling.... He and his family ... should be stripped of all of their assets [and] made to start over just like the thousands he made start all over”); Juror 377 (Skilling is “[s]mug,” “[g]reedy,” and “[d]isingenu[ous]”; he “had an active hand in creating and sustaining a fraud”). Defendants’ Renewed Motion for Change of Venue, Record, Doc. 618 (Sealed Exhs.) (hereinafter Skilling’s Renewed Venue Motion); see also App. 794a-797a (summarizing additional responses).

 Another 20 percent (about 59 of 283) indicated that they read the Chronicle or had otherwise heard about the Enron cases but did not report that they were victims or make comments suggesting possible bias against the defendants.

 See, e. g., Juror 29 (Skilling is “[n]ot an honest man”); Juror 104 (Skilling “knows more than he’s admitting”); Juror 211 (“I believe he was involved in wrong doings”); Juror 219 (“So many people lost their life savings because of the dishonesty of some members of the executive team”; Skilling was “[t]oo aggressive w[ith] accounting”); Juror 234 (“With his level of control and power, hard to believe that he was unaware and not responsible in some way”); Juror 240 (Skilling “[s]eems to be very much involved in criminal goings on”); Juror 255 (“[T]housands of people were taken advantage of by executives at Enron”; Skilling is “arrogant”; “Skilling was Andrew Fastow’s immediate superior. Fastow has plead[ed] guilty to felony charges. I believe Skilling was aware of Fastow’s illegal behavior”); Juror 263 (“Nice try resigning 6 months before the collaps[e], but again, he had to know what was going on”); Juror 272 (Skilling “[k]new he was getting out before the [d]am [b]roke”); Juror 292 (Skilling “[b]ailed out when he knew Enron was going down”); Juror 315 (“[H]ow could they not know and they seem to be lying about some things”); Juror 328 (“They should be held responsible as officers of this company for what happened”); Juror 350 (“I believe he greatly misused his power and affected hundreds of lives as a result”; “I believe they are all guilty. Their ‘doings’ affected not only those employed by Enron but many others as well”); Juror 360 (“I seem to remember him trying to claim to have mental or emotional issues that would remove him from any guilt. I think that is deceitful. It seems as though he is a big player in the downfall”); Juror 378 (“I believe he knew, and certainly should have known as the CEO, that illegal and improper [activities] were rampant in Enron”; “I believe all of them were instrumental, and were co-conspirators, in the massive fraud perpetrated at Enron”). Skilling’s Renewed Venue Motion.

 See App. 894a (Juror 43) (expressed the view that the defendants “stole money” from their employees); id., at 922a (Juror 55) (admitted that she “lean[ed] towards prejudging” the defendants); id., at 946a (Juror 71) (stated that she would place the burden of proof on the defendants); id., at 954a-960a (Juror 75) (indicated that she could not set aside her view that there was fraud at Enron); id., at 1003a-1006a (Juror 104) (stated that she questioned the defendants’ innocence and that she “would be very upset with the government if they could not prove their case”); id., at 1008a (Juror 112) (expressed that the view that the defendants were guilty).

 Of course, even if the jury selection process is adequate, a trial court violates a defendant’s right to an impartial jury if it erroneously denies a for-eause challenge to a biased venire member who ultimately sits on the jury. See, e. g., United States v. Martinez-Salazar, 528 U. S. 304, 316 (2000) (“[T]he seating of any juror who should have been dismissed for cause ... would require reversal”).

 Whether the District Court abused its discretion in declining to change venue pursuant to the Federal Rules of Criminal Procedure is a different question. See Fed. Rule Crim. Proc. 21(a) (“Upon the defendant’s motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there”). As this Court has indicated, its supervisory powers confer “more latitude” to set standards for the conduct of trials in federal courts than in state courts. Mu’Min v. Virginia, 500 U. S. 415, 424 (1991). While the circumstances may not constitutionally compel a change of venue “without pausing to examine ... the voir dire,” Rideau v. Louisiana, 373 U. S. 723, 727 (1963), the widely felt sense of victimhood among Houstonians and the community’s deep-seated animus toward Skilling certainly meant that the task of reliably identifying untainted jurors posed a major challenge, with no guarantee of success. It likely would have been far easier to empanel an impartial jury in a venue where the Enron story had less salience. I thus agree with the Court of Appeals that “[i]t would not have been imprudent for the [District] [C]ourt to have granted Skilling’s transfer motion.” 554 F. 3d 529, 558 (CA5 2009). Skilling, however, likely forfeited any Rule 21 or supervisory powers claim by failing to present it either in his opening brief before the Fifth Circuit, see id., at 559, n. 39, or in his petition for certiorari, cf. ante, at 378, n. 11.

 One of Skilling’s experts noted that, “[i]n cases involving 200 or more articles, trial judges granted a change of venue 59% of the time.” App. ¶30, at 611a.

 See, e. g., 554 F. 3d, at 559, n. 42 (“I’m livid, absolutely livid .... I have lost my entire friggin’ retirement to these people. They have raped all of us” (internal quotation marks omitted)); App. 382a (“Hurting that many elderly people so severely is, I feel, the equivalent of being an axe murderer. His actions were just as harmful as an axe murderer to the [community]” (alteration in original)); id., at 1152a-1153a (“Not having the stuff of suicide bombers, Enron’s executive pilots took full advantage of golden parachutes to bail out of their high-flying corporate jet after setting the craft on a course to financial oblivion. In a business time frame, Enron pancaked faster than the twin towers”); id., at 1163a (noting that “Skilling’s picture turned up alongside Osama bin Laden’s on ‘Wanted’ posters inside the company headquarters”).

 Among the highlights: In 2002, Skilling testified before Congress, and other Enron executives invoked their Fifth Amendment rights; Enron auditor Arthur Andersen was indicted, tried, convicted, and sentenced on charges of obstruction of justice; the Enron Task Force charged Enron chief financial officer and Skilling-protege Andrew Fastow with fraud, money laundering, and other crimes; and at least two Enron employees pleaded guilty on fraud and tax charges. In 2003, the Enron Task Force indicted numerous Enron employees, including Ben Glisan, Jr. (the company’s treasurer), Lea Fastow (wife of Andrew and an assistant treasurer), and more than half a dozen executives of Enron Broadband Services; several Enron employees entered guilty pleas and received prison sentences; and Enron filed its bankruptcy reorganization plan. In 2004, Andrew and Lea Fastow both pleaded guilty; Skilling and Causey were indicted in February; a superseding indictment adding Lay was filed in July; a number of additional Enron employees entered guilty pleas; and former Enron employees and Merrill Lynch bankers were defendants in a 6-week trial in Houston concerning an Enron deal involving the sale of Nigerian barges. In 2005, a 3-month trial was held in Houston for five executives of Enron Broadband Services; various pretrial proceedings occurred in the runup to the trial of Skilling, Lay, and Causey; and, three weeks before the scheduled trial date, Causey pleaded guilty to securities fraud.

 The majority points out that the jury selection processes in the three previous Enron trials that had been held in Houston were similarly brief. See ante, at 388-389. The circumstances of those cases, however, were very different. In particular, the defendants had not been personally subjected to anything approaching the withering public criticism that had been directed at Skilling and Lay. As earlier noted, see, e. g., supra, at 451, it was the trial of Skilling and Lay that was widely seen as the climactic event of the Enron saga. Accordingly, my conclusion that the jury selection process in this unusual ease did not suffice to select an impartial jury does not east doubt on the adequacy of the processes used in the earlier Enron prosecutions.
Moreover, in referencing the length of the voir dire in this case, I do not mean to suggest that length should be a principal measure of the adequacy of a jury selection process. Trial courts, including this one, should be commended for striving to be efficient, but they must always take care to ensure that their expeditiousness does not compromise a defendant’s fair-trial right. I also express no view with respect to court-led versus attorney-led voir dire. Federal Rule of Criminal Procedure 24(a) gives district courts discretion to choose between these options, and I have no doubt that either is capable of producing an impartial jury even *453 in high-profile eases so long as the trial court ensures that the scope of the voir dire is tailored to the circumstances.

 Juror 33 brought up the plea in response to the District Court’s question about whether he “recalled] listening to any particular programs about the ease.” App. 888a. Juror 96, meanwhile, told the court that he read the “whole” Houston Chronicle every day, including “all the articles about Enron.” Id., at 992a. The court, however, did not ask any questions designed to elicit information about the Causey plea. Instead, Juror 96 remarked on the plea only after Skilling’s counsel managed to squeeze in a followup as to whether he had “read about any guilty pleas in this case over the last month or two.” Id., at 993a.

 Portions of the voir dire transcript erroneously, refer to this prospective juror as “Juror 110.” See, e. g., id., at 996a.

 The court’s exchange with Juror 20 (who sat on the jury) is typical:
“Q. Do you remember reading any particular articles about this case or Mr. Lay or Mr. Skilling?
“A. Not until just recently this week, but nothing—
“Q. And there have been a lot of articles this week.
“A. Yeah.
“Q. Do you recall any particular articles you’ve read in the last week or so?
“A. Not word for word, no.
“Q. Did you read all the articles in the Sunday “Chronicle”?
“A. Some of them.
“Q. Which ones do you remember reading?
“A. The one about the trial, I think, and how the trial was going to work.” Id., at 873a-874a.

 The majority’s criticism of Skilling’s counsel for failing to ask questions of many of the prospective jurors, cf. ante, at 389, is thus misplaced. Given the District Court’s express warning early in the voir dire that it would not allow counsel “to ask individual questions if [they] abuse[d]” that right, App. 879a, counsel can hardly be blamed for declining *456 to test the court’s boundaries at every turn. Moreover, the court’s perfunctory exchanges with prospective jurors often gave counsel no clear avenue for further permissible inquiry.

 Although the District Court underestimated the extent of the community hostility, it was certainly aware of the ubiquity of the pretrial publicity, acknowledging that “all of us have been exposed to substantial media attention about this ease.” Id., at 841a. The court even made an offhand remark about one of the prior Enron prosecutions, “the Nigerian barge ease,” apparently expecting that the prospective jurors would understand the reference. Id., at 840a.

 Taking a more defendant-favorable line than most prospective jurors, Juror 17 stated that he “thought the guy [on the radio] was pretty narrow minded,” that “everyone should be considered innocent totally until they get a chance to come [to] court,” and that the Government might have been overzealous in some of its Enron-related prosecutions. Id., at 863a-864a. He added, however, that he “believe[d] there was probably some accounting fraud [at Enron].” Id-., at 864a. The District Court denied the Government’s request to remove Juror 17 for cause, but he did not ultimately sit on the jury.

 The majority attempts to downplay the significance of Juror 29 by noting that she did not end up on the jury because Skilling used a peremptory challenge to remove her. See ante, at 395, n. 31. The majority makes a similar point with respect to other venire members who were not ultimately seated. See ante, at 389-390, n. 24. The comments of these venire members, however, are relevant in assessing the impartiality of the seated jurors, who were similarly “part of a community deeply hostile to the accused” and who may have been “unwittingly . . . influenced by it.” Murphy v. Florida, 421 U. S. 794, 803 (1975); see also Irvin v. Dowd, 366 U. S. 717, 728 (1961). Moreover, the fact that the District Court failed to remove persons as dubiously qualified as Juror 29 goes directly to the adequacy of its voir dire. If Juror 29 made it through to the end of the selection process, it is difficult to have confidence in the impartiality of the jurors who sat, especially given how little is known about many of them. Cf. 6 LaFave § 23.2(f), at 288 (“The responses of those not seated casts light on the credibility of the seated jurors who were familiar with the same publicity”).

 The majority also notes that about two-thirds of the seated jurors and alternates (11 of 16) had no personal Enron connection. Ante, at 389-390, and n. 25. This means, of course, that five of the seated jurors and alternates did have connections to friends or colleagues who had lost jobs or money as a result of Enron’s collapse — a fact that does not strike me as particularly reassuring.

 As one of Skilling’s jury experts observed, there is a “tendency in voir dire of jury pool members in high-profile cases to minimize their exposure to media, their knowledge of prejudicial information, and any biases they may have.” App. ¶99, at 763a; see also id., ¶95, at 637a (“Those who perceive themselves or wish to be perceived as good citizens are reluctant to admit they cannot be fair”). For this reason, the fact that “none of *460 the seated jurors and alternates cheeked the 'yes’ box” on the written questionnaire when “asked whether they ‘ha[d] an opinion about [Skilling],’ ” ante, at 391, is of minimal significance, particularly given that the Causey plea and the impending trial received significant media coverage after the questionnaires were submitted.

 Many other seated jurors and alternates expressed similarly troubling sentiments. See, e. g., Supp. App. 57sa-60sa (Juror 20) (obtained Enron-related news from the Chronicle and “local news stations”; blamed Enron’s collapse on “[n]ot enough corporate controls or effective audit procedures to prevent mismanagement of corporate assets”; and was “angry that so many people lost their jobs and their retirement savings”); id., at 72sa-75sa (Juror 38) (followed Enron-related news from various sources, including the Chronicle; was “angry about what happened”; and “fe[lt] bad for those that worked hard and invested in the eorp[oration] only to have it all taken away”); id., at 117sa-118sa (Juror 64) (had several friends who worked at Enron and lost money; heard about the Enron cases on the news; described the collapse as “sad” because “people lost jobs [and] money — lots of money”; and believed the Government “did the right thing” in its investigation); id., at 177sa-181sa (Juror 87) (received Enron-related news from the Chronicle, Channel 13 news, the O’Reilly Factor, Internet news sources, and friends, family, and co-workers; attributed Enron’s collapse to “[p]oor management [and] bad judgment — greed”; lamented “[t]he sad state of the long-term loyal employees who are left with nothing in their retirement accounts”; and “admire[d] [the] bravery” of Enron whistleblower Sherron Watkins “for bringing the situation to the attention of the public, which stopped things from getting worse”); id., at 191sa-195sa (Juror 90) (heard Enron-related news from his wife, coworkers, and television; wrote that “[i]t’s not right for someone ... to take” away the money that the “small average worker saves ... for retirement all his life”; and described the Government’s Enron investigation as “a good thing”); id., at 221sa-225sa (Juror 113) (obtained information about Enron from a “co-worker [who] was in the jury pool for Mrs. Fastow’s trial”; worked for an employer who lost money as a result of Enron’s collapse; found it “sad” that the collapse had affected “such a huge number of people”; and thought “someone had to be doing something illegal”); id., at 236sa-237sa (Juror 116) (knew a colleague who lost money in Enron’s collapse; obtained Enron-related news from the “Houston Chronicle, Time *462 Magazine, local TV news [and] radio, Mends, family, [and] co-workers, [and] internet news sources”; and noted that what stood out was “[t]he employees and retirees that lost their savings”).

 Several other jurors fell into this category. Juror 67 wrote on his questionnaire that he had heard about Enron from the Chronicle and “Internet news sources.” Id., at 133sa. He was questioned for 90 seconds, during which time he indicated that he had read an article on the Internet the preceding night “about the jury selection taking place today, stuff like that.” App. 944a. Juror 99 wrote that she had not heard or read about the Enron cases and did not “know anything about” Enron. Supp. App. 210sa. The District Court questioned her for barely one minute. She stated that she had “[n]ot really” learned more about the case, but added that she had heard “this and that” from her parents. App. 995a-996a. The court did not press further.

 The majority suggests that the fact that Skilling “challenged only one of the seated jurors for cause” indicates that he did not believe the other jurors were biased. Ante, at 396. Our decisions, however, distinguish claims involving “the partiality of an individual juror” from antecedent claims directed at “the partiality of the trial jury as a whole.” Patton v. Yount, 467 U. S. 1025, 1036 (1984); see also Frazier v. United States, 335 U. S. 497, 514 (1948) (“[T]he two sorts of ehallenge[s] are distinct and are therefore to be dealt with separately”). If the jury selection process does not, as here, give a defendant a fair opportunity to identify biased jurors, the defendant can hardly be faulted for failing to make for-cause challenges.